**45C01-2010-CC-006068**

Filed: 10/23/2020 2:13 PM
Clerk

USDC IN/ND case 2:20-cv-00426-PPS-JEM document 4   filed 10/23/20   page 1 of 60

Lake Circuit Court
Lake County, Indiana

# IN THE LAKE COUNTY CIRCUIT COURT FOR THE 31ST JUDICIAL CIRCUIT
## STATE OF INDIANA

| | |
|---|---|
| ER GROUP, LLC D/B/A ENGINEERED RIGGING, an Indiana limited liability company, | |
| Plaintiff, | |
| v. | Case No. |
| FIGG BRIDGE BUILDERS, LLC, a Florida limited liability company; and GREAT AMERICAN INSURANCE AGENCY, INC., an Iowa limited liability company, | |
| Defendants. | |

## VERIFIED COMPLAINT

Plaintiff, ER GROUP, LLC D/B/A ENGINEERED RIGGING, an Indiana limited liability company ("ER Group" or "Plaintiff"), by and through its attorneys, Aronberg Goldgehn for its Verified Complaint against FIGG BRIDGE BUILDERS, LLC, a Florida limited liability company ("FBB") and GREAT AMERICAN INSURANCE AGENCY, INC., an Iowa limited liability company ("GAIC") (FBB and GAIC are collectively "Defendants"), state as follows:

## PARTIES, JURISDICTION AND VENUE

1.      ER Group is an Indiana limited liability company with its principal place of business located in Valparaiso, Indiana.

2.      FBB is a Florida limited liability company with its principal place of business located in Tallahassee, Florida, and is authorized to do business and does conduct business in Lake County, Indiana.

3.      GAIC is an Iowa limited liability company with its principal place of business located in Cedar Rapids, Iowa, and is authorized to do business and does conduct business in Lake County, Indiana.

4.      Jurisdiction and venue are proper in Lake County, Indiana because the location of the equipment at issue and the construction site related to the rental of the equipment in this case is in East Chicago, Lake County, Indiana.

## FACTUAL ALLEGATIONS

### A.      The Rental and Engineering Agreements

1.      On March 4, 2020, FBB entered into an Agreement (the "Engineering Agreement") with ER Group for engineering services related to a construction project at the Cline Avenue Bridge (the "Cline Avenue Bridge Project") located approximately over Indiana Harbor and Ship Canal in East Chicago, Indiana.  A true and correct copy of the Engineering Agreement is attached hereto as **Exhibit "1"** and is incorporated herein by this reference.

2.      On March 20, 2020, FBB entered into an Equipment Lease – Bare Rental Agreement (the "Rental Agreement") with ER Group for the rental of specific equipment and accessories as further described in the Rental Agreement. A true and correct copy of the Rental Agreement is attached hereto as **Exhibit "2"** and is incorporated herein by this reference.

3.      As part of the Cline Avenue Bridge Project, FBB as the contractor on the project, purchased a surety bond from GAIC (the "Surety" or "GAIC") on June 14, 2017, in the amount of One Hundred Ten Million Two Hundred Seventy Eight Thousand Nine Hundred Twelve and 00/100 Dollars ($110,278,912.00) (the "Surety Bond").  The owner of the Surety Bond is Cline Avenue Bridge, LLC (the "Owner"). A true and correct copy of the Surety Bond is attached hereto as **Exhibit "3"** and is incorporated herein by this reference.

4.      The Surety Bond states:

§1 The Contractor [FBB] and Surety [GAIC], jointly and severally, bind themselves, their heirs, executors, administrators, succesors and assigns to the Owner to pay of labor, material, materials and equipment furnished for use in the performance of hte Construction Contract, which is incorporated herein by this reference.

2

*See* Ex. 2.

5.      Furthermore, the Surety Bond specifically obligates the Surety to pay on behalf of FBB to the extent FBB does not perform its contracted-for obligations:

> §16.2 **Claimant**. An individual or entity [ER Group] having a direct contract with the Contractor [FBB] …to furnish labor, materials *or equipment* for use in the performance of the Construction Contact… the intent of this Bond shall be to include without limitation in the terms "labor, material or equipment that part of…rental equipment used in the Construction Contract…"

6.      The Rental Agreement reflects a term commencing on March 24, 2020 the later of March 30, 2020 or a later shipment date, as requested by FBB. Attached to the Rental Agreement are its Terms and Conditions whereby it states in paragraph 1:

> 1. Term: The Lease begins on the date the first piece of Equipment is shipped to Lessee [FBB], and ends on the date the last piece of Equipment is returned to Lessor [ER Group ].
>
> (the "Lease Term").

7.      The Rental Equipment was shipped to FBB by ER Group on March 31, 2020. A true and correct copy of the Straight Bill of Lading is attached hereto as **Exhibit "4"** and is incorporated herein by this reference.

8.      On June 1, 2020, ER Group notified FBB of outstanding invoices related to the Rental Agreement. On June 2, 2020, FBB acknowledged to Plaintiff *via* email that a balance was still outstanding and due.

9.      On June 4, 2020, ER Group received a letter from FBB notifying ER Group of the end of the Lease Term and informing ER Group that FBB's services had been terminated by the Owner of the Cline Avenue Bridge Project. A true and correct copy of the Letter dated June 3, 2020 Notification of Termination Letter is attached hereto as **Exhibit "5"** and is incoporated herein by this reference.

3

10.    Although the Rental Agreement specifically states that the Rental Equipment shall "remain in Lessee's possession and control at all times" and that the termination of the Rental Agreement shall occur on the date the last piece of Equipment is returned to ER Group, the Lease Equipment remained at the Cline Avenue Bridge Project location.

11.    On May 28, 2020 and June 16, 2020, ER Group sent FBB emails detailing all outstanding invoices (the "Outstanding Invoices") and balance due and owing to ER Group from FBB pursuant to the Rental Agreement.  True and correct copies of the Outstanding Invoices are attached as Group **Exhibit "6"** and are incorporated herein by this reference.

12.    FBB has failed to pay the Outstanding Invoices.

13.    On July 2, 2020, FBB advised ER Group that the Outstanding Invoices "should be sent to Great American Insurance Group for processing" and directed Plaintiff to FBB's surety, GAIC. A true and correct copy of the July 2, 2020 Email is attached hereto as **Exhibit "7"** and is incorporated herein by this reference.

14.    Despite numerous demands for payment, FBB has failed, refused and continues to fail and refuse to pay Plaintiff all amounts due under the Rental Agreement.

15.    As of September 30, 2020, FBB owes a total balance of $145,321.11 to Plaintiff pursuant to the Rental Agreement.  This amount does not include interest, late charges or attorney's fees and costs that have accrued under the Rental Agreement and the Engineering Agreement and that will continue to accrue.

### COUNT I
### BREACH OF THE RENTAL AGREEMENT BY FBB

16.    ER Group repeats and re-alleges paragraphs 1 through 15 as if fully set forth herein.

17.    The Rental Agreement is a valid and enforceable contract that requires FBB to, among other things, pay ER Group for expenses related to the rental of specific equipment

4

provided to FBB for the Cline Avenue Bridge Project.

18.    FBB has breached the Rental Agreement by, among other things, failing to pay ER Group the Outstanding Invoices, together with all other amounts due and owing under that agreement.

19.    To date, the total amount due to ER Group from FBB related to the Outstanding Invoices is $145,321.11.

20.    The amount due to ER Group from FBB continues to accrue.

21.    ER Group is also entitled to recover from FBB interest and expenses, including, without limitation, reasonable attorneys' fees and costs incurred by ER Group in connection with its enforcement of the Rental Agreement.

22.    ER Group has made a demand on FBB to pay the Outstanding Invoices, but FBB has failed to make payment.

23.    ER Group has performed all conditions precedent that may exist under the Rental Agreement.

WHEREFORE, Plaintiff, ER GROUP, LLC D/B/A ENGINEERED RIGGING, an Indiana limited liability company, respectfully requests that this Court enter judgment against FIGG BRIDGE BUILDERS, LLC, a Florida limited liability company, in the amount of $145,321.11, plus additional amounts and interest that continue to accrue, attorneys' fees, costs, and for any other relief this Court deems appropriate.

## COUNT II
## SURETY AGREEMENT

24.    ER Group repeats and re-allege paragraphs 1 through 15 as if fully set forth herein.

25.    The Surety obligates GAIC to pay ER Group on behalf of FBB pursuant to the Rental

Agreement and to pay the ER Group for all Outstanding Invoices related to the rental of the Rental Equipment for use in Cline Avenue Bridge Project.

26.     ER Group made a claim (Claim No. 797500276) ("ER Group's Surety Claim") to GAIC pursuant to the Surety Bond and provided notice to GAIC of the claim, as required. A true and correct copy of the ER Group's Claim No. 797500276 is attached hereto as **Exhibit "7"** and is incorporated herein by this reference.

27.     Despite ER Group's Surety Claim, GAIC refused payment and continues to refuse payment of FBB's Outstanding Invoices.

28.     To date, the total amount due to ER Group from GAIC for Outstanding Invoices is $145,321.11.

29.     ER Group has performed all conditions precedent that may exist under the Rental Agreement and provided the Rental Equipment to FBB covered by the Surety Bond.

WHEREFORE, Plaintiff, ER GROUP, LLC D/B/A ENGINEERED RIGGING, an Indiana limited liability company, respectfully requests that this Court enter judgment against GREAT AMERICAN INSURANCE AGENCY, INC., an Iowa limited liability company, in the amount of $145,321.11, plus additional amounts and interest that continue to accrue, attorneys' fees, costs, and for any other relief this Court deems appropriate.

By:     /s/ Maryam H. Arfeen
                One of Its Attorneys

Maryam H. Arfeen (marfeen@agdglaw.com)
**ARONBERG GOLDGEHN DAVIS & GARMISA**
*Attorney for Plaintiff*
330 N. Wabash Avenue, Suite 1700
Chicago, Illinois 60611
Phone: (312) 755-3185

6

## **VERIFICATION**

     Under penalties as provided by law, the undersigned certifies that the statements set forth in this instrument are true and correct except as to matters therein stated to be on information and belief, and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Dated: October 21, 2020

                           Christopher Cox, President
                           ER GROUP, LLC D/B/A ENGINEERED RIGGING, an Indiana limited liability company

7

# EXHIBIT 1

## AGREEMENT

THIS AGREEMENT, made as of March _____ 2020, by and between Figg Bridge Builders, LLC, 424 N. Calhoun Street, Tallahassee, Florida, 32301, hereinafter referred to as CONTRACTOR, and ER Group, LLC d/b/a Engineered Rigging, 4503 Stafordshire Lane, Valparaiso, IN   46383, hereinafter referred to as SUBCONSULTANT.

WHEREAS, CONTRACTOR entered into an agreement for engineering, procurement and construction for the Cline Avenue Bridge Project in East Chicago, Indiana (the "Project") with Cline Avenue Bridge, LLC hereinafter referred to as CUSTOMER, and;

WHEREAS, CONTRACTOR desires to retain SUBCONSULTANT for the purpose of performing engineering services as described in ARTICLE I - SCOPE OF WORK, and;

WHEREAS, SUBCONSULTANT is agreeable to undertaking the services under the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the mutual covenants hereinafter stipulated to be kept and performed, it is agreed between the parties hereto as follows:

ARTICLE I - SCOPE OF WORK

SECTION 1 - OBLIGATION OF SUBCONSULTANT TO CONTRACTOR

CONTRACTOR retains SUBCONSULTANT who agreed to proceed, upon verbal authorization by the CONTRACTOR issued on or about October 18, 2019, with all services necessary to the performance, in proper sequence and in the times specified, of the engineering services and on-site engineering services for the Project as outlined in Exhibit A.

The standard of care for all services performed by SUBCONSULTANT shall be in conformance with all professional engineering principles generally accepted as standards of the industry in the state or province where the Project is located for projects of similar size, type and complexity, and shall, subject to that standard, be sufficient for construction of the Project and conform to all standards relating to design contained in this Agreement. SUBCONSULTANT agrees to use professional care to perform the services in accordance with all applicable federal, state and local laws, permits, codes, ordinances, rules, regulations, orders and decrees of any government or quasi-government entity having jurisdiction over the parties, the Project or site, the practices involved in the Project or site, or any services.

SECTION 2 – SUBCONTRACTING

SUBCONSULTANT shall not subcontract any work covered by this Agreement without the prior written approval of CONTRACTOR.

SECTION 3 - SAFETY

CONTRACTOR contracts with SUBCONSULTANT as an independent contractor. SUBCONSULTANT shall perform  this Agreement in a safe and reasonable manner and in compliance   with   all   applicable   law.   SUBCONSULTANT   shall   comply   with CONTRACTOR's and CONTRACTOR's subcontractors' current safety requirements at the Delivery Location, including without limitation, the Traffic Control Plan, Safety Plan, and Security Plan, and with all applicable law when performing this Agreement. The requirement

to comply with CONTRACTOR's and CONTRACTOR's subcontractors' safety programs or CONTRACTOR's or CONTRACTOR's subcontractors' failure to stop SUBCONSULTANT's unsafe practices does not relieve SUBCONSULTANT from their responsibility for the safety of their employees and contractors. SUBCONTRACTOR shall notify CONTRACTOR immediately following a reportable incident at the Delivery Location under applicable rules, regulations, orders, and other lawful requirements, and promptly confirm the notice in writing.

## ARTICLE II - COMPENSATION

SUBCONSULTANT shall provide a progress report and an invoice to CONTRACTOR each month.   This progress report and invoice shall indicate the work SUBCONSULTANT accomplished to date. Payments will be consistent with Exhibit B. This submittal must be to the satisfaction of CONTRACTOR prior to processing the payment. Payments will be made within thirty (30) days after receipt of the required progress report and invoice.

## ARTICLE III - INSURANCE

SUBCONSULTANT shall maintain the insurance and comply with the terms in Exhibit C.

## ARTICLE IV - INDEMNIFICATION

SUBCONSULTANT shall indemnify, defend, and hold harmless CONTRACTOR, its parent, subsidiaries, affiliates, and each of their respective officers, directors, managers, agents, representatives and employees, from and against any and all suits, actions, legal proceedings, claims, demands, damages, liabilities, costs and expenses, including attorney's fees, to the extent arising out of or in connection with (a) any negligent act, error, breach, or omission, or willful misconduct of SUBCONSULTANT or anyone acting in his/its behalf in connection with or incident to this Agreement, or any allegation of the foregoing, or (b) any injury or death to any employee, contractor, or agent of SUBCONSULTANT or CONTRACTOR, or any allegation of the foregoing.

## ARTICLE V - COMMUNICATION WITH THE CUSTOMER

SUBCONSULTANT agrees that the communication with the CUSTOMER will be through CONTRACTOR's Project Manager, unless SUBCONSULTANT obtains CONTRACTOR's prior written consent to communicate directly with CUSTOMER, provided that, any subsequent communication by SUBCONSULTANT shall be made consistent with the scope of such consent.

## ARTICLE VI - COMMUNICATION WITH OUTSIDE ORGANIZATIONS AND INDIVIDUALS

SUBCONSULTANT agrees that all Project related information is to be held confidential and not to be released to any organization or individual other than those directly involved as a participant in the Project, without the express written consent of the CONTRACTOR.  These provisions shall not apply to information in whatever form that is in the public domain, nor shall they restrict the SUBCONSULTANT from giving notices required by law or complying with an order to provide information or data when such an order is issued by a court or administrative agency. Any requests for information from the press, civic groups, professional groups or other organizations or individuals, shall be passed on to CONTRACTOR for consideration and response.

Any professional credit taken from the Project, now or in the future, shall be specific as to the nature of the SUBCONSULTANT's work.  Any presentation, orally or in writing, which mention's SUBCONSULTANT's work on or involvement in the Project shall also state that Figg Bridge Engineers, Inc. was the bridge designer on the Project and Figg Bridge Builders, LLC was the

contractor on the Project. The SUBCONSULTANT shall not publish, display, or otherwise distribute any image or likeness of the Project produced as part of the Project or by CONTRACTOR without the express written approval of CONTRACTOR. Activities requiring such approval shall include, but not be limited to, use of Project images on marketing materials, website, and presentations to media and potential clients.

## ARTICLE VII – DISPUTES

In the event of any dispute between CONTRACTOR and SUBCONSULTANT involving any issue related to or arising under this Agreement or any work performed hereunder such dispute shall be resolved by:

a) First, the dispute shall be referred to senior management of each of the parties, who shall endeavor in good faith to reach an amicable resolution of the dispute within ten (10) business days of the referral to them, and then immediately implement any such resolution;

b) Second, if the senior management of the parties described in paragraph (a) above are unable to resolve the dispute within the ten (10) business day period, the parties shall proceed to non-binding mediation through a neutral and mutually acceptable mediator;

c) Third, if the dispute is still unresolved after mediation for a ten (10) business day period, the parties may proceed to binding arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then in effect. The arbitration shall be confidential.

SUBCONSULTANT agrees that it may, at the sole option of CONTRACTOR, be joined in any dispute resolution procedure involving CONTRACTOR and CUSTOMER if it involves any issue related to or arising under this Agreement or any work performed hereunder. SUBCONSULTANT shall not stop work under this Agreement pending any dispute, unless directed in writing to do so by CONTRACTOR.

## ARTICLE VIII – TERMINATION

### SECTION 1- TERMINATION FOR CAUSE

CONTRACTOR may terminate this Agreement for cause if the SUBCONSULTANT fails to supply enough properly skilled personnel to perform the required work within the time period set by CONTRACTOR, or if SUBCONSULTANT fails to make payment to those supplying labor or materials to SUBCONSULTANT so as to cause claims to be made by such persons or entities against CONTRACTOR, or if SUBCONSULTANT is otherwise breaches of any provision of this Agreement, or the contract documents relating thereto. Upon termination pursuant to this clause, any unpaid balance owed to SUBCONSULTANT may be retained by CONTRACTOR until such time as the final damages which may be incurred by CONTRACTOR as a result of this termination are known. Any such unpaid balance may be used by CONTRACTOR to offset all costs and damages incurred by CONTRACTOR as a result of such termination, including, but not limited to, any excess costs incurred to complete the scope of work of SUBCONSULTANT as set forth herein, and all costs of CONTRACTOR, including attorneys' fees, incurred as a result of SUBCONSULTANT's breach, this termination, and the additional contracts necessary to complete the SUBCONSULTANT's scope of work as set forth herein.

SECTION 2 – TERMINATION FOR CONVENIENCE

CONTRACTOR shall have the right to terminate this Agreement without cause and without fault of SUBCONSULTANT upon written notice to SUBCONSULTANT. Upon receipt of such notice, SUBCONSULTANT shall do no further work under the Agreement except such work as may be set forth in CONTRACTOR's termination notice. SUBCONSULTANT shall preserve and protect all materials, drawings, calculations and all other work performed by SUBCONSULTANT and make all such work available to CONTRACTOR. SUBCONSULTANT shall be entitled to payment, as its sole and exclusive remedy for such termination, for the value of all work satisfactorily performed by SUBCONSULTANT and tendered to CONTRACTOR. The value of such work shall be measured according to the terms
of this Agreement.

ARTICLE IX – GENERAL SECTIONS

SECTION 1 – HEADINGS All section headings herein are for convenience of reference only and are not part of this Agreement, and no construction or inference shall be derived therefrom.

SECTION 2 – SURVIVAL Termination of this Agreement for any reason whatsoever shall not affect any right or obligation of any party which is accrued or vested prior to such termination, and any provision of this Agreement relating to any such right or obligation shall be deemed to survive the termination of this Agreement. The indemnities, confidentiality obligations, and insurance requirements provisions set forth herein shall survive termination or expiration of this Agreement, in addition to any other provisions which by their nature should, or by their express terms do, survive or extend beyond termination or expiration of this Agreement.

SECTION 3 – GOVERNING LAW This Agreement shall be construed and governed in accordance with the laws of the State in which the Project is located, without regard to conflict of law principles.

SECTION 4 - ENTIRE AGREEMENT AND AMENDMENTS This Agreement, including the recitals hereto and the Exhibits referred to herein each of which is incorporated herein, constitutes the entire Agreement between the parties relating to the transaction described herein and supersedes any and all prior oral or written understandings. No amendment of any provision hereof shall be binding upon the parties, and neither party shall be deemed to have waived any provision or any remedy available to it unless such amendment or waiver is in writing and signed by a duly authorized officer of each party. CONTRACTOR may assign this Agreement and/or the rights hereunder to CUSTOMER.

SECTION 5 – COUNTERPARTS; DELIVERY This Agreement may be signed in counterparts and delivered via electronic mail which together will have the same effect as a single original copy signed by all of the parties.

SECTION 6 – INSTRUMENTS OF SERVICE All documents, records, programs, data, film, tape, articles, memoranda, and other materials developed under this Agreement shall be considered "work for hire" and SUBCONSULTANT assigns and transfers any ownership claim to CONTRACTOR and all such materials ("Work Product") will be the property of CONTRACTOR. SUBCONSULTANT agrees to execute and deliver such assignments or other documents as may be requested by CONTRACTOR. Use of Work Product other than related to contract performance by SUBCONSULTANT without CONTRACTOR's prior written consent is prohibited. SUBCONSULTANT shall be responsible for any loss of or damage to any of the Work Product developed for or supplied by CONTRACTOR and used to develop or assist in the Services provided herein while any such Work Product is in the possession or control of the SUBCONSULTANT.

Any loss or damage thereto shall be restored at SUBCONSULTANT's expense. SUBCONSULANT shall provide CONTRACTOR full, immediate, and unrestricted access to the Work Product during the term of this Agreement. SUBCONSULTANT represents that the Work Product does not infringe upon or misappropriate the intellectual property or other rights of any third party.

IN WITNESS WHEREOF, the parties hereto have subscribed their names and affixed their signatures on the date by their respective names to be effective as of the day and year first above written.

ATTEST:                                    FIGG BRIDGE BUILDERS, LLC

_____          _____
                                                 ~~Linda Figg~~      JAY ROHLEDER
                                                 ~~President/CEO~~  Project Manager
_____               3/4/2020
Date:                                         Date:

ATTEST:                                    ER GROUP, LLC, d/b/a, ENGINEERED RIGGING

_____          _____
                                                 Name:   Christopher E. Cox
                                                 Title:    President
                                                 Date:    March 4, 2020
_____
Date:


EXHIBIT A – SCOPE OF WORK AND SCHEDULE
EXHIBIT B – PAYMENTS
EXHIBIT C - INSURANCE

EXHIBIT A

Scope of Work and Schedule

1.    <u>Scope of Work</u>

    a.   Technical Design - Subconsultant will provide professional engineering services to design a "Beam and Winch" system for erecting precast balanced cantilever segments.  These design services will include performing the structural analysis and detailing of this system.  The deliverable product will be the calculations and "Released for Construction" drawings that will be used to fabricate the complete "Beam and Winch" system. The "Released for Construction" drawings will be signed and sealed by a registered PE in the State of Indiana.

       The Subconsultant will coordinate with the Contractor interactively while designing the system to work integrally with the Contractor's intended means and methods.

    b.   Field Technical Assistance – Subconsultant will provide field technicians to supervise the assembly of the "Beam and Winch" system in accordance with the design plans and monitor the safe use of all related equipment associated with lifting the precast segments into their permanent location. Field technicians provide by Subconsultant shall have the experience, qualifications, and any licenses and certifications applicable to providing such services.

2.    <u>Schedule</u>

       The technical design will be completed in a timeframe that is coordinated with the Contractor.  The design will be completed in a timely manner to allow fabrication to be completed and the system delivered to the site at least two weeks before the system is scheduled to be used for erecting the first cantilever of precast segments.

       The supporting field technicians will also be scheduled to arrive on site for supervising the timely assembly of the system with adequate lead time before the scheduled lifting of the first precast balanced cantilever segment using the "Beam and Winch" system.

       The field technician will coordinate with the Contractor to pause the field services after a cantilever is erected and return when a subsequent balanced cantilever begins "Beam and Winch" erection.

EXHIBIT B

Payments



February 28, 2020
Revision 0
Quote:19870901
P a g e | 1

FIGG Bridge Builders, LLC
219 Riley Road
East Chicago, IN 46312

Attention:      Jay Rohleder
Reference:      Cline Avenue Project Support- Engineering and Technician Support

Dear Jay,

Engineered Rigging (ER) respectfully submits the following T&M rates for providing engineering support, equipment rental, additional fabrications and a site field technician for your project.

1.   Engineering Support
   1.1.   Engineering Rates:

| Classification | Bill Rate |
|---|---|
| Principal Engineer | $200.00 |
| Professional Engineer | $175.00 |
| Senior Design Engineer | $150.00 |
| Design Engineer | $125.00 |

   1.2.   Current Engineering Cost to Complete:

| Classification | Total Hours | Rate | Billable |
|---|---|---|---|
| Principal Engineer | 0 | $200.00 | $0.00 |
| Professional Engineer | 40 | $175.00 | $7,000.00 |
| Senior Design Engineer | 586 | $150.00 | $87,900.00 |
| Design Engineer | 693 | $125.00 | $86,625.00 |
| Total | | | $181,525.00 |

2.   On-Site Technical Support

Daily Working Rates:

Mon.-Fri. (excluding Holidays): $1,800.00 per day up to 10 hours; $150.00 per hour additional
Saturdays: $2,000.00 per day up to 10 hours; $150.00 per hour additional
Sundays & Holidays: $2,400.00 per day up to 10 hours; $150.00 per hour additional
The above rates are all-inclusive. (I.e. Per Diem is included)

Non-Working Rates:

Mon.-Fri. (excluding Holidays): $1,200.00 per day
Saturdays: $350.00 per day
Sundays & Holidays: $350.00 per day
The above rates are all-inclusive. (I.e. Per Diem is included)

Travel Rates:

Travel days are billed as working days with the following rates:
Mon.-Fri. (excluding Holidays): $1,200.00 per day up to 10 hours; $150.00 per hour additional
Saturdays: $1,500.00 per day up to 10 hours; $150.00 per hour additional
Sundays & Holidays: $1,800.00 per day up to 10 hours; $150.00 per hour additional
The above rates are all-inclusive. (I.e. Per Diem is included)


Note: Personnel will not be expected to be on site for more than (16) consecutive hours during a (24) hour period.
In the event, site work is required on the day of travel, the total travel and site time shall not exceed (16) hours.

Expenses:

Travel Costs: Airfare, Car Rental, Tolls, Gas will be billed at Cost +15% (Receipts provided with invoice)

| Summary of Pricing Estimate | | |
|---|---|---|
| Item | Description | Amount |
| 1 | Engineering Support | $ 181,525.00 |
| 4 | On-site Technician Support (4 Weeks) | $ 42,100.00 |
| Total Estimate | | $ 223,625.00 |

Conditions/Terms:

1. General Terms and Conditions: To be mutually agreed upon.
2. Payment Terms:
   a. Engineering Support Billing
      i. Net 30
      ii. Billing Cycle: Monthly
   b. On-site Technician Support Billing
      i. Net 30
      ii. Billing Cycle: ~~Weekly~~ Monthly
3. ~~Any payments received beyond 30 days will have an automatic 5% late fee applied.  In addition to the 5% late fee, a daily interest fee will be applied at the rate of 1 Month Libor + 3.25% compounded daily until payment is received.~~ 3.  A finance charge of 1.5% will be computed monthly on undisputed amounts not paid within
   a. The above fee will not be charged to the current outstanding invoice #1252     30 days of receipt of the invoice.
4. Per Diem: As shown above
5. Mobilization & Demobilization: As shown above
6. Insurance to be supplied and maintained by Engineered Rigging.
   a. Comprehensive General Liability:
      i. Personal Injury             $2,000,000 Aggregate
                                     $1,000,000 Each Occurrence
   b. Comprehensive Auto Liability
      i. Combined Single Limit       $1,000,000
   c. Worker's Compensation
      i. Statutory and Employer Liability    $1,000,000

We greatly appreciate the opportunity and will work with your best interests in mind.  Please contact me to discuss any questions, comments or clarifications regarding this proposal.

Sincerely,

*Christopher E. Cox*

Christopher E. Cox, P.E.
President

EXHIBIT C

Insurance

SUBCONSULTANT shall maintain in full force and effect the following minimum insurance during the life of the Subcontract, and where specified for the time period following substantial completion of the Project.

- Property Insurance: SUBCONSULTANT and/or subcontractors are solely responsible for all materials, construction equipment, tools, instruments or instrumentation, or other equipment, whether owned or used by SUBCONSULTANT and/or subcontractors, and stored on-site, off-site, or when in transit from the commencement of the job until the Project is accepted as completed by Cline Avenue Bridge, LLC (the "CUSTOMER").

- Commercial General Liability Insurance: SUBCONSULTANT must provide Commercial General Liability (CGL) insurance including coverage for premises-operations, independent contractors, products-completed operations, personal injury and contractual liability. The contractual liability must include the tort liability of another assumed in a business contract. SUBCONSULTANT or his agent shall verify that there is no endorsement or modification of the CGL limiting the scope of coverage for liability arising from explosion, collapse, or underground property damage. This insurance shall be maintained throughout the duration of the Project and for a minimum of one year after completion of the work or longer if specified in CONTRACTOR's prime agreement. Limits shall be as follows:

|  |  |
|---|---|
| Each Occurrence Limit | |
| Bodily Injury/Property Damage Liability | $1,000,000 |
| Personal Injury Liability | $1,000,000 |
| General Aggregate Limit | $2,000,000 |
| Products/Completed Operations Aggregate Limit | $2,000,000 |

CONSULTANT is to be named as an additional insured in the SUBCONSULTANT's policy with respect to this Project. Verification of additional insured status shall be furnished CONTRACTOR by mailing a copy of the endorsement of Certificate of Insurance in accordance with the instructions in the EVIDENCE of INSURANCE section of this agreement.

This insurance will apply as primary insurance with respect to any other insurance or self-insurance CONTRACTOR may have or elect to carry with respect to this Project or contract.

- <u>Comprehensive Automobile Liability Insurance</u> covering liability for the use of any auto (owned, rented, leased, or hired vehicles) with limits of at least $1,000,000.00 combined for each person and for each accident and property damage;

- <u>Workers' Compensation</u>: SUBCONSULTANT shall provide and maintain workers compensation and employers liability insurance providing coverage in the state (or states) in which the Project is performed. Limits and coverage shall be as follows:

  | | |
  |---|---|
  | Workers Compensation Insurance | Statutory Benefits |
  | Employers Liability Insurance | $1,000,000 each accident |
  | | $1,000,000 policy limit |
  | | $1,000,000 each employee |

- Umbrella Excess Liability: SUBCONSULTANT shall provide umbrella excess liability insurance on an "occurrence" basis providing "following form" coverage for the underlying coverages outlined above with the following minimum limits:
  - Each Occurrence Limit        $5,000,000
  - Aggregate Limit               $5,000,000

SUBCONSULTANT should have their Agent/Broker confirm that the Umbrella Excess Liability policy provides follow-form coverage and includes Additional Insured status as required by contract.

- <u>Professional Liability</u>: SUBCONSULTANT will obtain and maintain in full force and effect a DESIGN PROFESSIONAL'S Professional Liability Insurance Policy (or similar Errors & Omissions policy), covering the performance of professional services specified under this Agreement. This policy shall have minimum limits of coverage of $5,000,000 Per Claim with at least $5,000,000 Annual Aggregate. Evidence of this insurance may be subject to review by CONTRACTOR'S Insurance Broker and shall be satisfactory in form and content to CONTRACTOR.

The issuance or maintaining of insurance of any type by SUBCONSULTANT or CONTRACTOR shall not be deemed or construed to release, limit, waive or discharge the SUBCONSULTANT from any or all of the obligations and risks imposed by this Agreement upon the SUBCONSULTANT, including any liability in excess of the insurance coverages required herein. Neither shall any forbearance nor omission by CONTRACTOR to require proof of insurance from SUBCONSULTANT before permitting SUBCONSULTANT to proceed or continue with the Work be deemed a waiver of CONTRACTOR's rights or the SUBCONSULTANT's obligations regarding the provision of insurance under this Subcontract. General and automobile liability and umbrella excess liability insurance shall name CONTRACTOR, its parent, subsidiaries, divisions, and affiliated companies and its and their officers, directors, employees, agents, heirs, assigns, successors in interest, and representatives, as well as the CUSTOMER, as Additional Insureds. Each policy of insurance obtained by SUBCONSULTANT shall provide that the insurer shall defend any suit against the Additional Insureds, even if such suit is frivolous or fraudulent. Said insurance shall include coverage for all operations, work subcontracted by SUBCONSULTANT, contractual obligations and products and completed operations. Certificates of Insurance, which comply with the requirements of the Subcontract Documents and are acceptable to CONTRACTOR, shall be delivered to CONTRACTOR prior to the SUBCONSULTANT commencing any Work hereunder.

EVIDENCE OF INSURANCE: SUBCONSULTANT shall furnish Certificates of Insurance to CONTRACTOR prior to commencement of the work. The certificate holder (and additional insured) should read as follows:

> FIGG BRIDGE BUILDERS, LLC
> ATTN: Gay W. Annin, CPA
> 424 N. Calhoun Street
> Tallahassee, Florida 323-01

The Certificate(s) of Insurance shall be signed by a duly authorized representative of each insurance company showing compliance with the insurance requirements set forth in this Article. The certificate should expressly state that if there is any material change in coverage (cancellation, expiration, or exclusion of a specifically required coverage such as completed operations) that SUBCONSULTANT or his agent will make every reasonable effort to notify CONTRACTOR at least 30 days prior to such change by written notice.

When requested by CONTRACTOR, SUBCONSULTANT shall furnish copies of Certificates of Insurance for each subcontractor or SUBCONSULTANT, which shall reference the name and address of the additional insured requesting the certificate.

Additionally, the insurance companies providing coverage must be rated "A-" or better by A. M. Best's most current edition and be licensed in the state in which the work is to be performed.  Any exceptions to the requirement of (1) being licensed by the state, or (2) having a Best's "A-" rating or better, must be referred to CONTRACTOR for prior approval.

If SUBCONSULTANT fails to maintain the required insurance as outlined above, CONTRACTOR shall have the right, but not the obligation, to purchase said insurance at the SUBCONSULTANT's expense. SUBCONSULTANT's failure to maintain insurance as required may result in termination of this contract at CONTRACTOR's option.  However, the failure of CONTRACTOR to demand Certificates of Insurance or evidence of full compliance of these insurance requirements shall not constitute a waiver of SUBCONSULTANT's obligation to maintain such insurance.

# EXHIBIT 2

**EQUIPMENT LEASE – BARE RENTAL AGREEMENT**

THIS EQUIPMENT LEASE-BARE RENTAL AGREEMENT (this Lease) in entered into as of the 20th day of March 2020 by and between ER Group, LLC d/b/a Engineered Rigging at 4503 Stafordshire Lane Valparaiso, IN 46383 ("Lessor") and the Lessee ("Lessee") identified as follows:

| Lessee Name:<br>Figg Bridge Builders, LLC | Lessee: Corporation, LLC, Partnership, or Other:<br>LLC |
|---|---|
| Lessee Shipping Address<br>Street: 219 Riley Road<br>City:    East Chicago<br>State:    IN    Zip:  46312 | Lessee Billing Address<br>Street: 219 Riley Road<br>City:    East Chicago<br>State:    IN    Zip:  46312 |
| Local Contact Name:  Jay Rohleder<br>Position: Senior Vice President / Project Manager<br>Email: jrohleder@figgbridge.com | Lessee Phone No: **610.368.0753**<br>Lessee Fax No.: |

**EQUIPMENT AND ATTACHMENTS LEASED**

| | | Equipment and Accessories | | | Rental Rate | |
|---|---|---|---|---|---|---|
| QTY | Model | Description | Replacement Value | Monthly Rate | Weekly Rate | Daily Rate |
| 2 | LHPP25 | Low Height - Push-Pull Unit | $125,000.00 | $29,250.00 | $9,750.00 | $3,300.00 |
| 2 | LHSB1A | Low Height - Skid Beam A | | | | |
| 2 | LHSB1B | Low Height - Skid Beam B | | | | |
| 24 | LHST1 | Low Height Skid Track | | | | |
| 1 | SFP613SJ | 6X1,3Lmin 150 Liter, Pendant Valve 480V 3Ph 11Kw (Generator Not Included) | | | | |
| 1 | HC9250C | 50' Hose, w/ two CH-604, .25" I.D. (1 Set for System) | | | | |
| 4 | HSL7006 | Strand Jack 700 kN - 15,7 mm | $270,000.00 | $38,700.00 | $12,900.00 | $4,300.00 |
| 4 | SLPP7E | Power Pack 7,5 kW Electric / SCC incl hose set, Datacable, RAM cable and powercable | | | | |
| 1 | SBSJSCC-V4 | Smartbox control for Strand Jack SCC | | | | |
| 1 | SBLT1 | Laptop for Strand Jack / Jack up Smartbox | | | | |
| 1 | SD1 | Strand dispenser | | | | |
| 1 | SSC06 | Strand 15,7 mm / price per coil; minimum order qty 1 coil = approx 8,000 | N/a | $5,500.00 Lump Sum (Consumable) | | |

1. All Pricing Above excludes taxes, tariffs, import/export and customs fees. Any additional fees incurred will be billed at cost+ 15%
2. If the rental period exceeds time stated above, rates above will apply as determined at the end of the next month or the return of the equipment, as applicable.

*JR 3/24/20 CEC*

the later of                              or a later shipment date, as requested by Lessee

Lessor hereby leases to Lessee the equipment and attachments identified above (the "Equipment"), and Lessee agrees to lease and pay for such Equipment from Lessor, subject to the terms and conditions of this Lease, at the Rental Rate listed above, for a minimum of **1 month** commencing on **3/30/20**, which minimum rent shall be paid on demand.  Any future payments will be due thirty (30) days following the determination of the amount due and if payment is received beyond the due date will have an automatic 5% late fee applied.  In addition to the 5% late fee, a daily interest fee will be applied at the rate of 1 Month Libor + 3.25% compounded daily until payment is received.  Rental Payment for the minimum rent shall be received by Lessor prior to release of equipment for shipment to Lessee's facility.  Rental rates are based upon monthly use not to exceed 160 hours per month.  Rental beyond 160 hours shall be prorated hourly and added to the base rental rate. All Equipment shall remain in Lessee's possession and control at *CEC* all times. The Equipment is to be located at: **Cline Avenue Bridge Replacement Project**. Freight, loading and other associated *JR* equipment and activities may be provided by Lessor and shall be governed by this agreement and the terms of the Lessor's proposal *3/24/20* incorporated herein by reference.  Rental Rate charges will be suspended and not charged for any down-time related to COVID-19.

THE EQUIPMENT and ATTACHMENTS ARE RENTED TO LESSEE ON A <u>BARE RENTAL BASIS ONLY</u>, in its "As Is" condition, except that the EQUIPMENT and ATTACHMENTS RENTED are not defective upon initial receipt. Lessee, at  its own expense, shall transport, operate, inspect, maintain and repair the Equipment, and return the Equipment to Lessor in the same condition as when delivered to Lessee, ordinary wear and tear from normal use excepted. LESSEE IS RESPONSIBLE FOR ENSURING COMPLIANCE BY IT AND ITS EMPLOYEES/AGENTS, AND OF THE EQUIPMENT ITSELF, WITH ALL, APPLICABLE, LAWS, REGULATIONS AND ORDINANCES, INCLUDING THE OCCUPATIONAL SAFETY AND HEALTH ACT AND REGULATIONS (SPECIFICALLY 29 C.F.R. 1926, SUBPART N – CRANES, DERRICKS, HOISTS, ELEVATORS AND CONVEYORS) and ALL APPLICABLE ANSI STANDARDS.     Lessor shall have no responsibility of any kind for compliance with any such laws, regulations, or ordinances during the period the Equipment is in Lessee's possession or control. See Operation, and inspection, Maintenance and Record Keeping requirements in the Terms and Conditions. Lessor's Rental Equipment Service Policy is incorporated herein by reference.

This Lease is expressly subject to the Terms and Conditions on the following pages, which are incorporated by reference.  Lessee is placed on notice that the terms and conditions of the following pages contain provisions that among other things: <u>require Lessee to indemnify others, including the Lessor (unless loss is due to Lessor's sole negligence or willful misconduct); waive all jury trials; and eliminate all warranties</u>

Lessee acknowledges that it has read and understands this Lease in its entirety, including the Terms and Conditions on the following pages. This Lease is executed by a duly authorized representative of Lessee.

Lessee: Figg Bridge Builders, LLC

By: _____

*JAY ROHLEDER*
(Print Name and Title)
*Project Manager*

Lessor: ER Group, LLC d/b/a Engineered Rigging

By: _____ *CEC*

Christopher E. Cox, President

Form revised 02-15-17

**Terms and Conditions**

1. Term: The Lease begins on the date the first piece of Equipment is shipped to Lessee, and ends on the date the last piece of Equipment is returned to Lessor.

2. Operation: The Equipment is supplied in accordance with the requirements of the OEM's Manufacturing and Design Specification. The Equipment shall be operated, inspected, maintained and repaired only by experienced, competent persons under Lessee's supervision and control. The Equipment shall be operated in a safe and lawful manner at all times, and in accordance with the manufacturer's operators manual, OSHA rules and ANSI standards. Lessee's operation of the Equipment shall not exceed the manufacturer's safety requirements and rated load capacities. Equipment shall not be used when overloaded, while the operator is under the influence of drugs or alcohol in violations of state or federal law, or to carry persons or property for hire.

3. Compliance with Laws and Standards: Lessee shall comply with and conform to all laws, regulations ordinances, rules and orders of any governmental entity relating to the possession, transportation, use, maintenance and repair of the Equipment, including but not limited to, all OSHA laws and regulations. Lessee shall also comply with all applicable ANSI Standards. Lessee shall indemnify and save Lessor harmless against actual or asserted violations thereof.

4. Title: All Equipment shall remain the property of Lessor at all times. Any Attachments, accessories, replacement parts, repairs or additions to the Equipment shall automatically become Lessor's property. Lessee shall keep the Equipment free from any and all liens, encumbrances and claims whatsoever, and shall not commit or permit any act to be committed which may encumber or impair Lessor's title or rights in the Equipment.

5. Acceptance: Lessee shall inspect the equipment immediately upon delivery. Acceptance of Equipment constitutes Lessee's acknowledgement that it has inspected the Equipment and that the Equipment is in good, safe, serviceable condition, and fit for the use intended. If the Equipment thereafter proves unfit for use because of accident or otherwise, Lessee's sole remedy is to return the Equipment and terminate this Lease.  Lessee shall pay all rental and other amounts due prior to termination, which shall never be less than rent due for the minimum rental period, transportation charges and costs of any repairs.

6. Insurance: Lessee, at its expense, shall take out, carry and maintain the following insurance in full force during the term of this Lease:
    a. Comprehensive general liability, including contractual liability, protecting against liability for property damage and personal injury or death arising out of the possession, use, operation, maintenance and repair of the Equipment, with limits of liability not less than $1,000,000 each occurrence; and a $2,000,000 general aggregate.
    b. Automobile liability, protecting against liability for property damage and personal injury or death arising out of the possession, use, operation and transportation of the Equipment, with limits of liability not less than $1,000,000 each occurrence;
    c. Inland marine all risk coverage (physical damage insurance), with any overload, boom and jib exclusion deleted, for the full replacement value of the Equipment in the amount indicated on the face hereof;
    d. Umbrella liability with limits of liability of not less than $3,000,000 and that follows the form of Liability policies listed in Section 6; and
    e. Worker's compensation and employer's liability insurance, in accordance with all applicable state and federal laws.

    All Insurance required hereunder shall be deemed the primary insurance of Lessor, shall name Lessor as an additionally insured party and loss payee, shall be maintained with responsible insurance companies of recognized standing of an AM Best rating of AVII or better, shall provide a waiver of subrogation with respect to the general liability, excess and auto liability coverage and shall provide that the coverage thereunder may be altered or canceled only after not less than 30 days prior written notice to Lessor. Lessee is solely responsible for any insurance premiums and deductibles and loss of usage of the Equipment. No "Other Insurance" provisions shall be applicable to Lessor or their underwriters by virtue of being named as an additional insured party and/or loss payee under the policy. Lessee shall furnish Lessor with certificate(s) of Insurance evidencing such coverage.

7. INDEMNIFICATION: <u>LESSEE SHALL DEFEND, INDEMNIFY AND HOLD HARMLESS THE LESSOR AND ITS OFFICERS, DIRECTORS, SHAREHOLDERS, PARTNERS, MEMBERS, MANAGERS, EMPLOYEES, AFFILIATES, REPRESENTATIVES AND AGENTS (THE "INDEMNITEES") FROM AND AGAINST ANY AND ALL ACTIONS, CAUSES OF ACTION, CLAIMS, SUITS, DEMANDS,</u>

INVESTIGATIONS, OBLIGATIONS, JUDGMENTS, LOSSES, COSTS, LIABILITIES, DAMAGES, FINES, PENALTIES AND EXPENSES, INCLUDING ATTORNEYS' FEES, WHICH ARE INCURRED BY, ACCRUED, ASSERTED, MADE OR BROUGHT AGAINST, OR RECOVERABLE FROM ANY OF THE INDEMNITEES ARISING FROM OR RELATING TO, DIRECTLY OR INDIRECTLY, THE LESSEE'S ACCEPTANCE, POSSESSION, TRANSPORT, USE, OPERATION, CONTROL, MAINTENANCE, AND/OR REPAIR OF THE EQUIPMENT, WHETHER OR NOT THE SAME ARISES FROM DAMAGE TO PROPERTY (REAL OR PERSONAL), INJURY OR DEATH TO PERSONS (INCLUDING BUT NOT LIMITED TO LESSEE'S EMPLOYEES, AGENTS AND REPRESENTATIVES), FAILURE TO COMPLY WITH APPLICABLE LAWS, REGULATIONS AND ORDINANCES, THE EQUIPMENT CONDITIONS, THE LOSS OF USE OR SEIZURE OF THE EQUIPMENT, OR OTHERWISE, EXCEPT TO THE EXTENT THE SAME ARE CAUSED BY THE INDEMNITEES' NEGLIGENCE OR WILLFUL MISCONDUCT OR PRODUCT DEFECT. LESSEE'S OBLIGATION TO INDEMNIFY THE INDEMNITEES SHALL SURVIVE THE TERMINATION OF THIS LEASE.

8.  NO WARRANTIES: LESSOR EXPRESSLY DISCLAIMS ANY AND ALL EXPRESS AND IMPLIED WARRANTIES AS TO THE EQUIPMENT (OTHER THAN PRODUCT DEFECT) INCLUDING ANY WARRANTY OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. LESSOR SHALL NOT BE LIABLE FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES relating to THE POSSESSION, transport, use, operation, control, maintenance and/or repair of the Equipment, or any loss, damage or injury resulting therefrom.

9.  Rent Adjustments: All Rental Rates are based upon an 8 hour day (daily rental), 40 hour week (weekly rentals), or 160 hour month (monthly rental) on a single day-shift operation. Lessee shall pay a proportionate hourly charge for all excess hours of usage. Lessee shall not be entitled to any abatement, deduction, reduction, set-off, counterclaim, recoupment or defense against rent for any reason, including any non-working time of the Equipment other than product defect.

10. Transportation: The Equipment will be loaded at Lessor's expense F.O.B. Lessor's yard or other point designated by Lessor. Lessee, at its own expense, shall do all other loading, unloading, installation, dismantling and transportation of the Equipment and shall pay all other freight, demurrage, storage, switching, drayage, rigging, trucking or other transportation charges (including but not limited to, fuel costs and taxes, mileage charges, weight and road use permits, highway taxes and any other IFTA taxes) from the time of loading by Lessor to and including the time of the Equipment's return to Lessor.  If the Equipment is transported on its own wheels, Lessee, at its own expense, shall provide a responsible person (at least 21 years of age with a valid driver's license) to accompany the Equipment to and from the shipping and receiving point. Equipment shall be returned to the destination designated by Lessor.

11. Payment: In addition to the payment of the Rental Rate specified on the front of this Lease, Lessee shall pay Lessor upon demand:
    a.  all taxes, levies, assessments, fees and other public charges against or upon any of the Equipment, including, but not limited to, personal property taxes, if applicable.
    b.  all fines, penalties, forfeitures, court costs, expenses and attorneys' fees arising with respect to Lessee's possession, transportation, use, maintenance or repair of the Equipment, including but not limited to any parking, traffic or other violations assessed against the Equipment, Lessor or Lessee.
    c.  Lessor's costs and expenses, including reasonable attorneys' fees (unless prohibited by law), incurred in enforcing this Lease, collecting any amounts due hereunder, or in repossessing the Equipment.
    d.  Any payments more than 30 days past due hereunder shall bear interest at 1.5% per month (or the maximum rate allowed by law, whichever is higher).

12. Inspection, Maintenance, Repairs and Record Keeping Requirements: Lessee shall effect and bear the expense of all necessary inspections, maintenance, adjustments and repairs required by the Equipment operator's manual and law, and shall maintain the Equipment at Lessee's expense in good working condition (including making all repairs occasioned by any accident). While Lessor shall have the right to inspect the Equipment at any time during normal business hours, Lessee agrees that Lessor has no control over the operation, use, maintenance or repair of the Equipment when it is in Lessee's possession or control.  Lessor shall have prompt access to the Equipment to properly maintain and repair same if Lessee fails to do so or upon Lessor's demand, all at Lessee's cost. Lessor shall make or have the right to direct all repairs occasioned by any accident, all at Lessee's expense.
    OSHA regulations pertaining to the equipment require daily, monthly (or other periodic) and annual inspections. Lessee is solely responsible for conducting these inspections and for otherwise ensuring that the Equipment meets, and is operated in accordance with, OSHA requirements and ANSI Standards.
    Lessee shall keep a written record of all inspections. Lessor also furnishes the following items with the leased equipment to assist Lessee with required regulation compliance; operation manual; and load capacity. Lessee will be charged a $500 fee for each missing item not returned with the Equipment.

13. Damage: If Lessor determines that the returned Equipment has been subject to damage or excess wear and tear, or improper usage, Lessee agrees to pay Lessor upon demand all costs to restore the Equipment to the same condition as when initially leased, ordinary wear and tear from normal use excepted.  Lessee exclusively bears all risk of loss or damage to the Equipment, accidental or otherwise. The replacement value(s) stated on the face hereof shall be used to determine the value of the Equipment in order to establish the amount of the loss or damage thereto.  No rent, paid or due, shall apply to the payment of such loss or damage. The Lease term and rental period shall continue to run until all repairs to the Equipment are completed and fully paid by Lessee.

14. Accidents: Lessee shall within 24 hours notify Lessor of any accident involving personal injury and/or property damage arising from the transportation, possession, use, maintenance or repair of the Equipment. Lessee shall immediately deliver any summons, pleading notice, or paper of any kind involving any claim, suit or proceeding relating to any accident or event involving the Equipment. Lessee shall not aid or abet the assertion of any such claim, suit or proceeding, and shall fully cooperate with the Lessor in investigating and defending the same. Lessor shall have immediate access to, and right of retrieval and repair of, the Equipment. Lessor shall make or have the right to direct all repairs occasioned by any accident, all at Lessee's expense.

15. Default: Lessor may declare this Lease in default if any one or more of the following occurs: (a) Lessee fails to make any payment required hereunder when due; (b) Lessee fails to properly operate, maintain or repair the Equipment; (c) Lessee fails to observe or perform any other covenant or requirement of this Lease; (d) Lessee attempts to sell, transfer or encumber the Equipment; (e) a voluntary or involuntary proceeding is instituted in any court of competent jurisdiction, seeking a decree or order (i) for relief in respect of Lessee under any applicable bankruptcy, insolvency, reorganization, assignment, for the benefit of creditors, or other similar law, or (ii) for the appointment of a receiver, liquidator, assignee, custodian, trustee, or similar official of Lessee or its property, or (iii) for the winding up or liquidation of the Lessee's affairs; (f) Lessee shall generally fail to pay its debts as they come due, and/or (g) Lessee, in Lessor's opinion, shall become financially insecure.  At any time after such declaration, Lessor may enter, with or without legal process, any premises where the Equipment is located and take possession thereof. Lessee shall provide Lessor with unobstructed ingress and egress for such purpose. Furthermore, Lessee shall immediately pay to Lessor all amounts then due hereunder and all costs of removal and repossession of the Equipment. Lessor's remedies herein shall be cumulative and are in addition to all other remedies existing at law or in equity.

16. No Assignment or Sub-Lease: This Lease may not be assigned by Lessee and the Equipment may not be offered by Lessee for use or sublet to any other person or entity without Lessor's prior written consent (which consent may be withheld for any reason). Any consent by Lessor to an assignment or sub-lease shall not release Lessee from any obligations under the Lease.  The foregoing notwithstanding, Lessee may assign use of the equipment herein to Subcontractors for use in connection with this Project.

17. Jury Waiver: <u>UNLESS PROHIBITED BY LAW, LESSEE AND LESSOR EACH KNOWINGLY UNCONDITIONALLY AND IRREVOCABLY WAIVE TRIAL BY JURY WITH RESPECT TO ANY ACTION, CLAIM, SUIT OR PROCEEDING WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE IN RESPECT OF, ARISING OUT OF, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM (OR AS TO ANY THIRD PARTIES) IN CONNECTION WITH THIS LEASE, ANY OTHER DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION WITH, THE CONDUCT OF THE PARTIES, OR THE TRANSACTION RELATED HERETO.</u>

18. Full Agreement; Governing Law; Waiver; Severability; This Lease, together with any addenda attached, constitute the full agreement of Lessor and Lessee. Any changes to this Lease must be evidenced in writing signed by Lessor and Lessee. This Lease shall be binding upon and shall inure to the benefit of the parties hereto, their respective successors and permitted assigns. The law of the state where the Lessor's office is located where this Lease was issued shall control this Lease. Headings are provided for convenience only, not for Interpretation of the Lease.  Lessor and Lessee are independent entities, and neither Lessee nor any operator of the Equipment shall be deemed to be the agent, servant or employee of Lessor for any reason or purpose. No failure of Lessor to enforce performance of any terms or covenants or to exercise or delay in exercising any right, under this Lease shall operate as a waiver thereof;  nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. If any provision of this Lease is held to be invalid or illegal by any Court of competent jurisdiction, the invalid or illegal term will be deemed excluded from the Lease and will not invalidate the remaining terms of the Lease.

RENTAL EQUIPMENT SERVICE POLICY

1. Lessees who rent equipment on a bare-rental basis are responsible for the inspection, operation, use, maintenance and repair of the equipment in the Lessee's possession. Lessees, therefore, must perform the following items at their expense:

   a. Inspect the equipment prior to use on a daily, monthly and annual basis as per the applicable requirements.

   b. Ensure that the equipment is operated only by competent persons.

   c. Perform preventative maintenance on the equipment in accordance with the manufacturer's recommendations.

   d. Adjust and/or repair the equipment to ensure that the equipment is in a safe working condition and complies with OSHA regulations.

2. Lessees are responsible for returning the equipment in the same condition as when delivered, ordinary wear and tear excepted. Any damage to the equipment resulting from failure to maintain or care for the equipment, abuse of the equipment, operation of the equipment under abnormal or unreasonable conditions or any other cause, accidental or otherwise, is the Lessee's responsibility.

3. At the Lessee's request Lessor will perform maintenance, adjustments or repairs to the equipment. Lessor will charge Lessee for all such service work except in those cases where the condition(s) necessitating the service work results from ordinary wear and tear to the equipment. The charge to Lessee for such service work will be for labor (at the hourly service charge in effect and based on portal-to-portal determination), transportation costs, parts and materials.

4. Lessor will provide repair service as requested at agreed upon rates. Lessee will be responsible for applicable hours effect at the time of service.

5. Upon arrival at a job site, Lessor's personnel shall have access to the equipment to begin operations within one (1) hour of arrival. Excess time is an additional chargeable item to Lessee's account.

6. Upon termination of the rental, the equipment will be returned to Lessor's yard for inspection. Should there be any damages for which the Lessee is responsible, Lessor will invoice for these damages under the same purchase order as the rental.

7. Lessor will attempt to notify Lessee of any charges in a timely manner. Lessee's cooperation in this matter is appreciated. Should Lessee have any questions concerning the charges, please contact Lessor's Service Department.

8. Lessor assumes no Responsibility for labor back charges, due to downtime.

9. Lessee shall notify Lessor to declare Equipment off rent. Lessee will provide the name of their representative to inspect Equipment, with Lessor, before it is returned to Lessor's yard for determining any repairs or damage to Equipment which occurred during the rental term.

10. When requesting needed repairs, Lessee must give Lessor the unit number and a brief explanation of the issues, prior to Lessor sending a service tech.

EQUAL OPPORTUNITY EMPLOYER

Form revised 02-15-17

<u>INSURANCE REQUIREMENTS</u>

All of the policies listed below must be on an occurrence basis for claims and be primary to any other insurance provided by Lessor.

1. Comprehensive general liability, including contractual liability, protecting against liability for property damage and personal injury or death arising out of the possession, use, operation, maintenance and repair of the Equipment, with limits of liability not less than $1,000,000 each occurrence; and a $2,000,000 general aggregate;

2. Automobile liability, protecting against liability for property damage and personal injury or death arising out of the possession, use, operation and transportation of the Equipment, with limits of liability not less than $1,000,000 each occurrence:

3. Inland marine all risk coverage (physical damage insurance), with any overload, boom and jib exclusion deleted, for the full replacement value of the Equipment in the amount indicated on the face hereof;

4. Umbrella liability with limits of liability of not less than $1,000,000 and that follows form on all liability policies;

5. Worker's compensation and employer's liability insurance, in accordance with all applicable state and federal laws;

6. All Insurance required hereunder shall be deemed primary insurance of Lessor. All policies, excluding Worker's Compensation, shall name Lessor as an additionally insured party, loss payee and provide a waiver of subrogation. Lessee's policies shall be maintained with responsible insurance companies of recognized standing and shall provide that the coverage thereunder may not be altered or canceled after not less than 30 days prior written notice to Lessor;

7. Lessee is solely responsible for any insurance premiums and deductibles, and loss of usage of the Equipment;

8. No "Other Insurance" provisions shall be applicable to Lessor or their underwriters by virtue of being named as an additionally Insured party and/or loss payee under the policy;

9. Lessee shall furnish Lessor with certificate(s) of Insurance evidencing such coverage;

10. Equipment to be covered:  As stated above

11. Certificate of Insurance must be signed, not typed. If a disclaimer page is sent an Additional Insurance Endorsement Form must be sent. The name of the Lessee on the Bare Rental Agreement and the name of the insured on the certificate of insurance (COI) must be the same. If it is an affiliated company, you must reference that in the Description area of the COI. <u>*Must list equipment Make/Model/Serial Number, and Unit Number with Replacement Value.</u> See contract for information. <u>No blanket Certificate accepted.</u>

12. Certificate of Insurance and other notifications shall be sent to : <u>ccox@engineeredrigging.com</u>

# EXHIBIT 3

Bond No.    1517337

# Document A312™ – 2010

Conforms with The American Institute of Architects AIA Document 312

## Payment Bond

**CONTRACTOR:**
*(Name, legal status and address)*

Figg Bridge Builders, LLC

424 Calhoun St

Tallahassee, FL 32301

**SURETY:**
*(Name, legal status and principal place of business)*

Great American Insurance Company

301 East Fourth Street

Cincinnati, OH 45202
**Mailing Address for Notices**

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contractor, Surety, Owner or other party shall be considered plural where applicable.

**OWNER:**
*(Name, legal status and address)*

Cline Avenue Bridge, LLC

219 Riley Road

East Chicago, IN 46312

**CONSTRUCTION CONTRACT**
Date:    June 8, 2017

Amount: $ 110,278,912.00     One Hundred Ten Million Two Hundred Seventy Eight Thousand Nine Hundred Twelve Dollars and 00/100

Description:
*(Name and location)*
Cline Avenue Bridge (over Indiana Harbor and Ship Canal in East Chicago, Indiana)

**BOND**
Date:    June 14, 2017

*(Not earlier than Construction Contract Date)*

Amount: $ 110,278,912.00     One Hundred Ten Million Two Hundred Seventy Eight Thousand Nine Hundred Twelve Dollars and 00/100

Modifications to this Bond:       ☐ None       ☒ See Section 18

| **CONTRACTOR AS PRINCIPAL** | | **SURETY** | |
|---|---|---|---|
| Company: | *(Corporate Seal)* | Company: | *(Corporate Seal)* |
| Figg Bridge Builders, LLC | | Great American Insurance Company | |
| Signature: _____ | | Signature: _____ | |
| Name and Title: | | Name and Title: Paula J. Teague  Attorney-in-Fact | |

*(Any additional signatures appear on the last page of this Payment Bond.)*

*(FOR INFORMATION ONLY — Name, address and telephone)*

**AGENT or BROKER:**
L A Surety Solutions LLC
121 S. Sherrin Avenue
Louisville, KY 40207
502-895-9377
S-2149/AS 8/10

**OWNER'S REPRESENTATIVE:**
*(Architect, Engineer or other party:)*

**§ 1** The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference, subject to the following terms.

**§ 2** If the Contractor promptly makes payment of all sums due to Claimants, and defends, indemnifies and holds harmless the Owner from claims, demands, liens or suits by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract, then the Surety and the Contractor shall have no obligation under this Bond.

**§ 3** If there is no Owner Default under the Construction Contract, the Surety's obligation to the Owner under this Bond shall arise after the Owner has promptly notified the Contractor and the Surety (at the address described in Section 13) of claims, demands, liens or suits against the Owner or the Owner's property by any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract and tendered defense of such claims, demands, liens or suits to the Contractor and the Surety.

**§ 4** When the Owner has satisfied the conditions in Section 3, the Surety shall promptly and at the Surety's expense defend, indemnify and hold harmless the Owner against a duly tendered claim, demand, lien or suit.

**§ 5** The Surety's obligations to a Claimant under this Bond shall arise after the following:

**§ 5.1** Claimants, who do not have a direct contract with the Contractor,
  - .1   have furnished a written notice of non-payment to the Contractor, stating with substantial accuracy the amount claimed and the name of the party to whom the materials were, or equipment was, furnished or supplied or for whom the labor was done or performed, within ninety (90) days after having last performed labor or last furnished materials or equipment included in the Claim; and
  - .2   have sent a Claim to the Surety (at the address described in Section 13).

**§ 5.2** Claimants, who are employed by or have a direct contract with the Contractor, have sent a Claim to the Surety (at the address described in Section 13).

**§ 6** If a notice of non-payment required by Section 5.1.1 is given by the Owner to the Contractor, that is sufficient to satisfy a Claimant's obligation to furnish a written notice of non-payment under Section 5.1.1.

**§ 7** When a Claimant has satisfied the conditions of Sections 5.1 or 5.2, whichever is applicable, the Surety shall promptly and at the Surety's expense take the following actions:

**§ 7.1** Send an answer to the Claimant, with a copy to the Owner, within sixty (60) days after receipt of the Claim, stating the amounts that are undisputed and the basis for challenging any amounts that are disputed; and

**§ 7.2** Pay or arrange for payment of any undisputed amounts.

**§ 7.3** The Surety's failure to discharge its obligations under Section 7.1 or Section 7.2 shall not be deemed to constitute a waiver of defenses the Surety or Contractor may have or acquire as to a Claim, except as to undisputed amounts for which the Surety and Claimant have reached agreement. If, however, the Surety fails to discharge its obligations under Section 7.1 or Section 7.2, the Surety shall indemnify the Claimant for the reasonable attorney's fees the Claimant incurs thereafter to recover any sums found to be due and owing to the Claimant.

**§ 8** The Surety's total obligation shall not exceed the amount of this Bond, plus the amount of reasonable attorney's fees provided under Section 7.3, and the amount of this Bond shall be credited for any payments made in good faith by the Surety.

**§ 9** Amounts owed by the Owner to the Contractor under the Construction Contract shall be used for the performance of the Construction Contract and to satisfy claims, if any, under any construction performance bond. By the Contractor furnishing and the Owner accepting this Bond, they agree that all funds earned by the Contractor in the performance of the Construction Contract are dedicated to satisfy obligations of the Contractor and Surety under this Bond, subject to the Owner's priority to use the funds for the completion of the work. .

§ 10 The Surety shall not be liable to the Owner, Claimants or others for obligations of the Contractor that are unrelated to the Construction Contract. The Owner shall not be liable for the payment of any costs or expenses of any Claimant under this Bond, and shall have under this Bond no obligation to make payments to, or give notice on behalf of, Claimants or otherwise have any obligations to Claimants under this Bond.

§ 11 The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

§ 12 No suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the state in which the project that is the subject of the Construction Contract is located or after the expiration of one year from the date (1) on which the Claimant sent a Claim to the Surety pursuant to Section 5.1.2 or 5.2, or (2) on which the last labor or service was performed by anyone or the last materials or equipment were furnished by anyone under the Construction Contract, whichever of (1) or (2) first occurs. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

§ 13 Notice and Claims to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the page on which their signature appears. Actual receipt of notice or Claims, however accomplished, shall be sufficient compliance as of the date received.

§ 14 When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted herefrom and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. When so furnished, the intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

§ 15 Upon request by any person or entity appearing to be a potential beneficiary of this Bond, the Contractor and Owner shall promptly furnish a copy of this Bond or shall permit a copy to be made.

**§ 16 Definitions**
§ 16.1 Claim. A written statement by the Claimant including at a minimum:

.1   the name of the Claimant;
.2   the name of the person for whom the labor was done, or materials or equipment furnished;
.3   a copy of the agreement or purchase order pursuant to which labor, materials or equipment was furnished for use in the performance of the Construction Contract;
.4   a brief description of the labor, materials or equipment furnished;
.5   the date on which the Claimant last performed labor or last furnished materials or equipment for use in the performance of the Construction Contract;
.6   the total amount earned by the Claimant for labor, materials or equipment furnished as of the date of the Claim;
.7   the total amount of previous payments received by the Claimant; and
.8   the total amount due and unpaid to the Claimant for labor, materials or equipment furnished as of the date of the Claim.

§ 16.2 Claimant. An individual or entity having a direct contract with the Contractor or with a subcontractor of the Contractor to furnish labor, materials or equipment for use in the performance of the Construction Contract. The term Claimant also includes any individual or entity that has rightfully asserted a claim under an applicable mechanic's lien or similar statute against the real property upon which the Project is located. The intent of this Bond shall be to include without limitation in the terms "labor, materials or equipment" that part of water, gas, power, light, heat, oil, gasoline, telephone service or rental equipment used in the Construction Contract, architectural and engineering services required for performance of the work of the Contractor and the Contractor's subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished.

§ 16.3 Construction Contract. The agreement between the Owner and Contractor identified on the cover page, including all Contract Documents and all changes made to the agreement and the Contract Documents.

**§ 16.4 Owner Default.** Failure of the Owner, which has not been remedied or waived, to pay the Contractor as required under the Construction Contract or to perform and complete or comply with the other material terms of the Construction Contract.

**§ 16.5 Contract Documents.** All the documents that comprise the agreement between the Owner and Contractor.

**§ 17** If this Bond is issued for an agreement between a Contractor and subcontractor, the term Contractor in this Bond shall be deemed to be Subcontractor and the term Owner shall be deemed to be Contractor.

**§ 18** Modifications to this bond are as follows:

SEE ATTACHED DUAL OBLIGEE RIDER

*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

**CONTRACTOR AS PRINCIPAL**

Company:                                    *(Corporate Seal)*

**SURETY**

Company:                                    *(Corporate Seal)*

Signature: _____

Name and Title:

Address

Signature: _____

Name and Title:

Address

S-2149/AS 8/10

# EXHIBIT 4



## STRAIGHT BILL OF LADING FORM

| | |
|---|---|
| REVISION: | 0 |
| DATE: | 3/31/2020 |
| DOC. TITLE: | Bill of Lading |
| PROJ. TITLE: | Corp. Std. Form |
| PAGE: | 1 of 1 |

| | | | |
|---|---|---|---|
| SHIPMENT DATE: | 3/31/2020 | BOL #: | 1987033120001 |

| SHIP FROM: | | SHIP TO: | |
|---|---|---|---|
| COMPANY: | ENGINEERED RIGGING | COMPANY: | FIGG BRIDGE BUILDERS |
| STREET: | 300 INDUSTRIAL BLVD | STREET: | 219 RILEY ROAD |
| CITY,STATE,ZIP: | RUSSELLVILLE, AR 72802 | CITY,STATE,ZIP: | EAST CHICAGO, IN 46312 |
| ATTN: | Jess Jones; 501-215-3303 | ATTN: | Jay Rohleder; 610-368-0753 |

**CARRIER INFORMATION**

| | | | |
|---|---|---|---|
| COMPANY: | MSA | TRUCK #: | |
| DRIVER NAME: | | TRUCK STATE & PLATE #: | |
| LICENSE #: | | TRAILER STATE & PLATE #: | |

**FREIGHT INFORMATION**

| QTY | UOM | DESCRIPTION | WT/ EA | TOTAL WT |
|---|---|---|---|---|
| 4 | | STRAND JACK POWERPACK | 600 | 2,400 |
| 1 | | SPLIT FLOW PUMP | 1,400 | 1,400 |
| 2 | | SLIDER BASE | 2,900 | 5,800 |
| 1 | | EXTRA SKID TRACK | 2,200 | 2,200 |
| 1 | | ENERPAC SKID SYSTEM | 2,800 | 2,800 |
| 1 | | STRAND WIRE & CAGE | 8,000 | 8,000 |
| 1 | | GANGBOX: CYLINDERS, FASTENERS, TOOLS | 1,000 | 1,000 |
| 1 | | BASKET: PLATES | 3,000 | 3,000 |
| 1 | | CRATE: HYDRAULIC HOSES | 1,000 | 1,000 |
| | | *Christopher Cox: 219-712-4579* | | |
| | | | TOTAL WEIGHT (LBS) | 27,600 |

| SHIPPER SIGNATURE/DATE | CARRIER SIGNATURE/PICKUP DATE |
|---|---|
| *Jess Jones* 3-31-20 | |

This is to certify that the above named materials are properly classified, packaged, marked, and labeled, and are in proper condition for transportation according to the applicable regulations of the DOT.

Carrier acknowledges receipt of packages and required placards. Carrier certifies emergency response information was made available and/or carrier has the DOT emergency response guidebook or equivalent documentation in the vehicle. Property described above is received in good order, except as noted.

FRM-EQMT-002 R0 BOL

# STRAIGHT BILL OF LADING FORM

| DOC. NUMBER: | FRM-EQMT BOL |
| REVISION: | 0 |
| DATE: | 3/31/2020 |
| DOC. TITLE: | Bill of Lading |
| PROJ. TITLE: | Corp. Std. Form |
| PAGE: | 1 of 1 |

SHIPMENT DATE: _____3/31/2020_____  BOL #: _____1987033120002_____

| **SHIP FROM:** | | **SHIP TO:** | |
|---|---|---|---|
| COMPANY: | ENGINEERED RIGGING | COMPANY: | FIGG BRIDGE BUILDERS |
| STREET: | 300 INDUSTRIAL BLVD | STREET: | 219 RILEY ROAD |
| CITY,STATE,ZIP: | RUSSELLVILLE, AR 72802 | CITY,STATE,ZIP: | EAST CHICAGO, IN 46312 |
| ATTN: | Jess Jones; 501-215-3303 | ATTN: | Jay Rohleder; 610-368-0753 |

### CARRIER INFORMATION

| COMPANY: | MSA | TRUCK #: | |
| DRIVER NAME: | | TRUCK STATE & PLATE #: | |
| LICENSE #: | | TRAILER STATE & PLATE #: | |

### FREIGHT INFORMATION

| QTY | UOM | DESCRIPTION | WT/ EA | TOTAL WT |
|---|---|---|---|---|
| 1 | | LIFT FRAME | 6,800 | 6,800 |
| 1 | | SJ PLATFORMS, HANDRAIL, LADDERS, & SJ ADAPTERS | 5,800 | 5,800 |
| 1 | | SJ ANCHORS | 800 | 800 |
| 2 | | STRAND JACK SKIDS | 3,200 | 6,400 |
| 1 | | JACK CHAIRS | 1,200 | 1,200 |
| 4 | | STRAND UMBRELLAS | 800 | 3,200 |
| 1 | | TRUSS BRACE | 1,800 | 1,800 |
| 2 | | POWER PLATFORM | 500 | 1,000 |
| | | | | |
| | | | | |
| | | Christopher Cox:  219-712-4579 | | |
| | | | | |

| | TOTAL WEIGHT (LBS) | 27,000 |

SHIPPER SIGNATURE/DATE          3 - 31 - 20

This is to certify that the above named materials are properly classified, packaged, marked, and labeled, and are in proper condition for transportation according to the applicable regulations of the DOT.

CARRIER SIGNATURE/PICKUP DATE

Carrier acknowledges receipt of packages and required placards. Carrier certifies emergency response information was made available and/or carrier has the DOT emergency response guidebook or equivalent documentation in the vehicle. Property described above is received in good order, except as noted.

EXHIBIT 5

Building Bridge Landmarks™



June 3, 2020

**VIA EMAIL:**
ccox@engineeredrigging.com

Mr. Christopher E. Cox, PE
ER Group, LLC
409 East Lincolnway
Valparaiso, IN 46383

REFERENCE: Cline Avenue Bridge Project
Equipment Leased & On-Site

Dear Mr. Cox:

This is notice of ending the term for the lease agreement, dated March 5, 2020, between FIGG Bridge Builders, LLC (FIGG) and ER Group, LLC, for Beam & Winch equipment. Please arrange with the owner for the return of your equipment from the Cline Avenue Bridge project site.

FIGG received a termination of the Cline Avenue Bridge project contract from the owner of the project, Cline Avenue Bridge, LLC, which FIGG has disputed and has filed a lawsuit against the owner for such wrongful termination. FIGG was directed to leave the site, without an opportunity to collect and return any equipment.

Due to actions of Cline Avenue Bridge, LLC, any lease payments for the period before April 7, 2020 can be sent to FIGG for processing. Any amounts related to the period after April 7, 2020 need to be processed through the owner, Cline Avenue Bridge, LLC. If you are not satisfied with payments received by the owner for any amounts after April 7, you may present a written claim to us for those charges and we will use our best efforts to pass your claim through as part of our litigation against the owner.

Please coordinate collecting the associated leased equipment or entering into a separate agreement with the owner, Cline Avenue Bridge, LLC. The suggested contact is Terry Velligan, General Manager at Cline Avenue Bridge, LLC (219.712.2515)

Sincerely,
FIGG BRIDGE BUILDERS, LLC

William (Jay) J. Rohleder, Jr., P.E., S.E.
Project Manager

Attachments
xc:    Ms. Linda Figg (FIGG)
        Mr. Alan R. Phipps, P.E., S.E. (FIGG)

424 North Calhoun Street, Tallahassee, Florida 32301-1298 ▪ 850.224.7402

# EXHIBIT 6

ER hopes to have lease terms negotiated with the new general contractor by the end of the week, and will inform Figg of the status of those discussions.  Please advise if Figg will be honouring the terms of the Rental Agreement and Service Agreement with ER, and when we can expect payment from Figg.  If Figg does not intend to honour the agreements, ER will initiate collection procedures with the surety immediately in an effort to mitigate Figg's late payment fees.

Please advise as soon as possible.

Sincerely,

Christopher E. Cox, P. E. | President
Engineered Rigging
P. 844 -474 -4448 | C. 219 -712 -4579
e. ccox@ engineeredrigging com
a. 409 East Lincolnway, Valparaiso, IN 46383
a. 300 Industrial Blvd, Russelville AR 72802
w. www engineeredrigging com
Engineering, Transport & Lift Solutions & Fabrication

Authorized Distributor for ENERPAC Heavy Lifting Technology

**From:** Rohleder, Jay <jrohleder@figgbridge.com>
**Sent:** Wednesday, June 3, 2020 9:55 PM
**To:** P. E. Christopher E. Cox (ccox@engineeredrigging.com) <ccox@engineeredrigging.com>
**Cc:** Figg, Linda <lfigg@figgbridge.com>; Phipps, Alan <aphipps@figgbridge.com>
**Subject:** Cline Avenue Bridge Project - End Lease Term

Christopher:
The attached letter provides notice of ending the Cline Bridge project equipment lease.
Regards,
Jay

William J. (Jay) Rohleder Jr., P.E., S.E.
Senior Vice President / Project Manager
FIGG Bridge Builders, LLC

Mobile: 610.368.0753
jrohleder@figgbridge.com
http://www.figgbridge.com

This e-mail and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed.  If you have received this e-mail in error please notify the system manager.  Please note that any views or opinions presented in this e-mail are solely those of the author and do not necessarily represent those of FIGG Engineering Group.  Finally, the recipient should check this e-mail and any attachments for the presence of viruses.  FIGG accepts no liability for any damage caused by any virus transmitted by this e-mail.

**ER Group LLC, d/b/a Engineered Rigging**
4503 Stafordshire Lane
Valparaiso, IN  46383
ccox@engineeredrigging.com



# INVOICE

**BILL TO**
Figg Bridge Builders, LLC
219 Riley Rd
East Chicago, IN  463121626
USA

| | |
|---|---|
| **INVOICE #** | 1291 |
| **DATE** | 04/14/2020 |
| **DUE DATE** | 04/28/2020 |
| **TERMS** | Due on receipt |

**CUSTOMER PO:**
Per Attached Rental Agreement

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| | **Equipment Rental**<br>2-LHPP25 Low Height - Push-Pull Unit<br>2-LHSB1A Low Height - Skid Beam A<br>2-LHSB1B Low Height - Skid Beam B<br>24-LHST1 Low Height Skid Track<br>1-SFP613SJ 6X1,3Lmin 150 Liter, Pendant<br>Valve 480V 3Ph 11Kw (Generator Not Included)<br>1-HC9250C 50' Hose, w/ two CH-604, .25" I.D.<br>(1 Set for System)<br>Month 1: 03/31/2020 to  04/27/2020 (UPDATED<br>TO REFLECT ACTUAL)<br>Month 2: 04/28/2020 to 05/25/2020 | 1 | 29,250.00 | 29,250.00 |
| | **Equipment Rental**<br>4-HSL7006 Strand Jack 700 kN - 15,7 mm<br>4-SLPP7E Power Pack 7,5 kW Electric / SCC<br>incl hose set, Datacable, RAM cable and<br>powercable<br>1-SBSJSCC-V4 Smartbox control for Strand<br>Jack SCC<br>1-SBLT1 Laptop for Strand Jack / Jack up<br>Smartbox<br>1-SD1 Strand dispenser<br>Month 1: 03/31/2020 to  04/27/2020 (UPDATED<br>TO REFLECT ACTUAL)<br>Month 2: 04/28/2020 to 05/25/2020<br><br>Rental is Portal to Portal.  Anticipated pick up<br>date 03/16/2020.  Payment must be made for<br>equipment to be released. | 1 | 38,700.00 | 38,700.00 |

Wire/ACH Information:



600 E. 84th Avenue / Merrillville, IN 46410

Any payments received beyond its due date will have an automatic 5%
late fee applied.  In addition to the 5% late fee, a daily interest fee will
be applied at the rate of 1 Month Libor + 3.25% compounded daily
until payment is received.

BALANCE DUE

**$67,950.00**

Wire/ACH Information:



600 E. 84th Avenue / Merrillville, IN 46410

**ap@engineeredrigging.com**

| | |
|---|---|
| **From:** | ER Group LLC, d/b/a Engineered Rigging <ap@engineeredrigging.com> |
| **Sent:** | Tuesday, April 14, 2020 10:37 AM |
| **To:** | tjenkins@figgbridge.com; jrohleder@figgbridge.com; gwannin@figgbridge.com |
| **Cc:** | eddy@engineeredrigging.com; ccox@engineeredrigging.com; ap@engineeredrigging.com; gmaxwell@engineeredrigging.com; rschlyer@engineeredrigging.com |
| **Subject:** | Month 2 Invoice 1291 from ER Group LLC, d/b/a Engineered Rigging |
| **Attachments:** | Invoice_1291_from_ER_Group_LLC_dba_Engineered_Rigging.pdf; Untitled attachment 00187.pdf |



## ER Group LLC, d/b/a Engineered Rigging

Dear Figg Bridge Builders, LLC,

Here's your invoice! We appreciate your prompt payment.

Thanks for your business!
ER Group LLC, d/b/a Engineered Rigging

INVOICE 1291

**DUE 04/14/2020**

# $67,950.00

Print or save

Powered by QuickBooks

ER Group LLC, d/b/a Engineered Rigging

4503 Stafordshire Lane Valparaiso, IN 46383

1

**ap@engineeredrigging.com**

| | |
|---|---|
| **From:** | ER Group LLC, d/b/a Engineered Rigging <quickbooks@notification.intuit.com> |
| **Sent:** | Thursday, May 21, 2020 10:29 AM |
| **To:** | tjenkins@figgbridge.com; jrohleder@figgbridge.com; gwannin@figgbridge.com |
| **Cc:** | eddy@engineeredrigging.com; ccox@engineeredrigging.com; ap@engineeredrigging.com; gmaxwell@engineeredrigging.com; rschlyer@engineeredrigging.com |
| **Subject:** | LATE Invoice 1291 from ER Group LLC, d/b/a Engineered Rigging |
| **Attachments:** | Invoice_1291_from_ER_Group_LLC_dba_Engineered_Rigging.pdf; 19870901-cline bridge equipment bare rental agreement-03052020.pdf |

INVOICE 1291



## ER Group LLC, d/b/a Engineered Rigging

Dear Figg Bridge Builders, LLC,

Attached is our Invoice 1291 which is now in excess of 30 days past due for the equipment rental. We understand that there are organizational matters delaying project completion, but the equipment remains subject to the lease terms. We appreciate your prompt payment.

Thanks for your business!
ER Group LLC, d/b/a Engineered Rigging

**DUE 04/14/2020**

# $67,950.00

Print or save

Powered by QuickBooks

1

**ER Group LLC, d/b/a Engineered Rigging**
4503 Stafordshire Lane
Valparaiso, IN  46383
ccox@engineeredrigging.com



# INVOICE

**BILL TO**
Figg Bridge Builders, LLC
219 Riley Rd
East Chicago, IN  463121626
USA

**INVOICE #** 1293
**DATE** 04/24/2020
**DUE DATE** 05/24/2020
**TERMS** Net 30

**CUSTOMER PO:**
SegmentEngineering

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| | **Engineering Support**<br>Senior Design Engineer Billable Hours-Week 10 to Week 14 of 2020 | 94 | 150.00 | 14,100.00 |
| | **Engineering Support**<br>Design Engineer Billable Hours-Week 10 to Week 14 of 2020 | 149 | 125.00 | 18,625.00 |
| | **Engineering Support**<br>Professional Engineer Billable Hours-Week 1 to Week 14 of 2020 | 40 | 175.00 | 7,000.00 |

Any payments received beyond 30 days will have an automatic 1.5% finance charged computed monthly applied.

**BALANCE DUE**          **$39,725.00**

Wire/ACH Information:



600 E. 84th Avenue / Merrillville, IN 46410

**ap@engineeredrigging.com**

| | |
|---|---|
| **From:** | ER Group LLC, d/b/a Engineered Rigging <ap@engineeredrigging.com> |
| **Sent:** | Friday, April 24, 2020 1:40 PM |
| **To:** | tjenkins@figgbridge.com; jrohleder@figgbridge.com; gwannin@figgbridge.com |
| **Cc:** | ap@engineeredrigging.com; eddy@engineeredrigging.com; ccox@engineeredrigging.com; rschlyer@engineeredrigging.com |
| **Subject:** | Invoice 1293 from ER Group LLC, d/b/a Engineered Rigging |
| **Attachments:** | Invoice_1293_from_ER_Group_LLC_dba_Engineered_Rigging.pdf; Untitled attachment 00309.pdf |



## ER Group LLC, d/b/a Engineered Rigging

Dear Figg Bridge Builders, LLC,

Here's your invoice! We appreciate your prompt payment.

Thanks for your business!
ER Group LLC, d/b/a Engineered Rigging

INVOICE 1293

**DUE 05/24/2020**

# $39,725.00

Pay invoice

Powered by QuickBooks

ER Group LLC, d/b/a Engineered Rigging

4503 Stafordshire Lane Valparaiso, IN 46383

1

**ap@engineeredrigging.com**

| | |
|---|---|
| **From:** | ER Group LLC, d/b/a Engineered Rigging <quickbooks@notification.intuit.com> |
| **Sent:** | Thursday, May 21, 2020 10:46 AM |
| **To:** | tjenkins@figgbridge.com; jrohleder@figgbridge.com; gwannin@figgbridge.com |
| **Cc:** | ap@engineeredrigging.com; eddy@engineeredrigging.com; ccox@engineeredrigging.com; rschlyer@engineeredrigging.com |
| **Subject:** | Reminder: Invoice 1293 from ER Group LLC, d/b/a Engineered Rigging |
| **Attachments:** | 1987-cab_er services agreement w exhibits_2292020-fully executed.pdf; Invoice_1293 _from_ER_Group_LLC_dba_Engineered_Rigging.pdf |

INVOICE 1293



## ER Group LLC, d/b/a Engineered Rigging

Dear Figg Bridge Builders, LLC,

Just a reminder that we have not received a payment for this invoice yet. Let us know if you have questions.

Thanks for your business!
ER Group LLC, d/b/a Engineered Rigging

**DUE 05/24/2020**

# $39,725.00

Pay invoice

Powered by QuickBooks

ER Group LLC, d/b/a Engineered Rigging

1

**ER Group LLC, d/b/a Engineered Rigging**
4503 Stafordshire Lane
Valparaiso, IN  46383
ccox@engineeredrigging.com



# INVOICE

**BILL TO**
Figg Bridge Builders, LLC
219 Riley Rd
East Chicago, IN  463121626
USA

**INVOICE #** 1294
**DATE** 04/24/2020
**DUE DATE** 05/24/2020
**TERMS** Net 30

**CUSTOMER PO:**
SegmentFabrication

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|------|----------|-----|------|--------|
| | **Equipment Sales**<br>Material, Processing & Fabrication iaw Attached<br>agreement for Bridge Segment System | 1 | 14,856.54 | 14,856.54 |

Any payments received beyond 30 days will have an automatic 1.5%
finance charged computed monthly applied.

**BALANCE DUE**                    **$14,856.54**



Wire/ACH Information:

600 E. 84th Avenue / Merrillville, IN 46410

**ap@engineeredrigging.com**

| | |
|---|---|
| **From:** | ER Group LLC, d/b/a Engineered Rigging <ap@engineeredrigging.com> |
| **Sent:** | Friday, April 24, 2020 1:43 PM |
| **To:** | tjenkins@figgbridge.com; jrohleder@figgbridge.com; gwannin@figgbridge.com |
| **Cc:** | ap@engineeredrigging.com; eddy@engineeredrigging.com; ccox@engineeredrigging.com; rschlyer@engineeredrigging.com |
| **Subject:** | Invoice 1294 from ER Group LLC, d/b/a Engineered Rigging |
| **Attachments:** | Invoice_1294_from_ER_Group_LLC_dba_Engineered_Rigging.pdf; Untitled attachment 00313.pdf |



## ER Group LLC, d/b/a Engineered Rigging

Dear Figg Bridge Builders, LLC,

Here's your invoice! We appreciate your prompt payment.

Thanks for your business!
ER Group LLC, d/b/a Engineered Rigging

INVOICE 1294

**DUE 05/24/2020**

# $14,856.54

Print or save

Powered by QuickBooks

ER Group LLC, d/b/a Engineered Rigging

4503 Stafordshire Lane Valparaiso, IN 46383

1

**ap@engineeredrigging.com**

| | |
|---|---|
| **From:** | ER Group LLC, d/b/a Engineered Rigging <quickbooks@notification.intuit.com> |
| **Sent:** | Thursday, May 21, 2020 10:46 AM |
| **To:** | tjenkins@figgbridge.com; jrohleder@figgbridge.com; gwannin@figgbridge.com |
| **Cc:** | ap@engineeredrigging.com; eddy@engineeredrigging.com; ccox@engineeredrigging.com; rschlyer@engineeredrigging.com |
| **Subject:** | Reminder: Invoice 1294 from ER Group LLC, d/b/a Engineered Rigging |
| **Attachments:** | 1987-cab_er purchase agreement w exhibits_2292020-fully executed.pdf; Invoice_1294 _from_ER_Group_LLC_dba_Engineered_Rigging.pdf |

INVOICE 1294



## ER Group LLC, d/b/a Engineered Rigging

Dear Figg Bridge Builders, LLC,

Just a reminder that we have not received a payment for this invoice yet. Let us know if you have questions.

Thanks for your business!
ER Group LLC, d/b/a Engineered Rigging

**DUE 05/24/2020**

# $14,856.54

Print or save

Powered by QuickBooks

ER Group LLC, d/b/a Engineered Rigging

1

**ER Group LLC, d/b/a Engineered Rigging**
4503 Stafordshire Lane
Valparaiso, IN  46383
ccox@engineeredrigging.com



# INVOICE

**BILL TO**
Figg Bridge Builders, LLC
219 Riley Rd
East Chicago, IN  463121626
USA

| | |
|---|---|
| **INVOICE #** | 1295 |
| **DATE** | 04/24/2020 |
| **DUE DATE** | 05/24/2020 |
| **TERMS** | Net 30 |

**CUSTOMER PO:**
SegmentFabrication

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|------|----------|-----|------|--------|
| | **Equipment Sales**<br>Material Supply and shipping 800 Series Plates | 1 | 49,197.60 | 49,197.60 |
| | **Equipment Sales**<br>Labor Supply for Fabrication of 800 Series Plates | 1 | 26,234.00 | 26,234.00 |

Any payments received beyond 30 days will have an automatic 1.5% finance charged computed monthly applied.

**BALANCE DUE**

## $75,431.60



600 E. 84th Avenue / Merrillville, IN 46410

**ap@engineeredrigging.com**

| | |
|---|---|
| **From:** | ER Group LLC, d/b/a Engineered Rigging <ap@engineeredrigging.com> |
| **Sent:** | Friday, April 24, 2020 1:48 PM |
| **To:** | tjenkins@figgbridge.com; jrohleder@figgbridge.com; gwannin@figgbridge.com |
| **Cc:** | ap@engineeredrigging.com; eddy@engineeredrigging.com; ccox@engineeredrigging.com; rschlyer@engineeredrigging.com |
| **Subject:** | Invoice 1295 from ER Group LLC, d/b/a Engineered Rigging |
| **Attachments:** | Invoice_1295_from_ER_Group_LLC_dba_Engineered_Rigging.pdf; Untitled attachment 00328.pdf |



## ER Group LLC, d/b/a Engineered Rigging

Dear Figg Bridge Builders, LLC,

Here's your invoice! We appreciate your prompt payment.

Thanks for your business!
ER Group LLC, d/b/a Engineered Rigging

INVOICE 1295

**DUE 05/24/2020**

# $75,431.60

Print or save

Powered by QuickBooks

ER Group LLC, d/b/a Engineered Rigging

4503 Stafordshire Lane Valparaiso, IN 46383

1

**ap@engineeredrigging.com**

| | |
|---|---|
| **From:** | ER Group LLC, d/b/a Engineered Rigging <quickbooks@notification.intuit.com> |
| **Sent:** | Tuesday, May 5, 2020 3:42 PM |
| **To:** | tjenkins@figgbridge.com; jrohleder@figgbridge.com; gwannin@figgbridge.com |
| **Cc:** | eddy@engineeredrigging.com; ccox@engineeredrigging.com; ap@engineeredrigging.com; gmaxwell@engineeredrigging.com; rschlyer@engineeredrigging.com |
| **Subject:** | Invoice 1298 from ER Group LLC, d/b/a Engineered Rigging |
| **Attachments:** | Invoice_1298_from_ER_Group_LLC_dba_Engineered_Rigging.pdf |



## ER Group LLC, d/b/a Engineered Rigging

Dear Figg Bridge Builders, LLC,

Here's your invoice! We appreciate your prompt payment.

Thanks for your business!
ER Group LLC, d/b/a Engineered Rigging

INVOICE 1298

**DUE 05/25/2020**

# $67,950.00

Print or save

Powered by QuickBooks

ER Group LLC, d/b/a Engineered Rigging

4503 Stafordshire Lane Valparaiso, IN 46383

**ER Group LLC, d/b/a Engineered Rigging**
4503 Stafordshire Lane
Valparaiso, IN  46383
ccox@engineeredrigging.com



# INVOICE

**BILL TO**
Figg Bridge Builders, LLC
219 Riley Rd
East Chicago, IN  463121626
USA

**INVOICE #** 1298
**DATE** 05/05/2020
**DUE DATE** 05/25/2020
**TERMS** Due on receipt

**CUSTOMER PO:**
Per Attached Rental Agreement

| DATE | ACTIVITY | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| | **Equipment Rental**<br>2-LHPP25 Low Height - Push-Pull Unit<br>2-LHSB1A Low Height - Skid Beam A<br>2-LHSB1B Low Height - Skid Beam B<br>24-LHST1 Low Height Skid Track<br>1-SFP613SJ 6X1,3Lmin 150 Liter, Pendant<br>Valve 480V 3Ph 11Kw (Generator Not Included)<br>1-HC9250C 50' Hose, w/ two CH-604, .25" I.D.<br>(1 Set for System)<br>Month 1: 03/31/2020 to  04/27/2020 (UPDATED<br>TO REFLECT ACTUAL)<br>Month 2: 04/28/2020 to 05/25/2020<br>Month 3: 05/26/2020 to  06/22/2020 | 1 | 29,250.00 | 29,250.00 |
| | **Equipment Rental**<br>4-HSL7006 Strand Jack 700 kN - 15,7 mm<br>4-SLPP7E Power Pack 7,5 kW Electric / SCC<br>incl hose set, Datacable, RAM cable and<br>powercable<br>1-SBSJSCC-V4 Smartbox control for Strand<br>Jack SCC<br>1-SBLT1 Laptop for Strand Jack / Jack up<br>Smartbox<br>1-SD1 Strand dispenser<br>Month 1: 03/31/2020 to  04/27/2020 (UPDATED<br>TO REFLECT ACTUAL)<br>Month 2: 04/28/2020 to 05/25/2020<br>Month 3: 05/26/2020 to 06/22/2020<br><br>Rental is Portal to Portal. | 1 | 38,700.00 | 38,700.00 |

8 600 E. 84th Avenue / Merrillville, IN 46410

Any payments received beyond its due date will have an automatic 5%
late fee applied.  In addition to the 5% late fee, a daily interest fee will
be applied at the rate of 1 Month Libor + 3.25% compounded daily
until payment is received.

BALANCE DUE

**$67,950.00**

Wire/ACH Information:
Receiving Bank: Centier Bank
ABA Routing Number: 071902878
Beneficiary: ER Group, LLC / d.b.a. Engineered Rigging
Centier Bank Deposit Account Number: 102964998
600 E. 84th Avenue / Merrillville, IN 46410

**ap@engineeredrigging.com**

| | |
|---|---|
| **From:** | ER Group LLC, d/b/a Engineered Rigging <quickbooks@notification.intuit.com> |
| **Sent:** | Thursday, May 21, 2020 10:47 AM |
| **To:** | tjenkins@figgbridge.com; jrohleder@figgbridge.com; gwannin@figgbridge.com |
| **Cc:** | ap@engineeredrigging.com; eddy@engineeredrigging.com; ccox@engineeredrigging.com; rschlyer@engineeredrigging.com |
| **Subject:** | Reminder: Invoice 1295 from ER Group LLC, d/b/a Engineered Rigging |
| **Attachments:** | 1987-cab_er purchase agreement w exhibits_2292020-fully executed.pdf; Invoice_1295 _from_ER_Group_LLC_dba_Engineered_Rigging.pdf |

INVOICE 1295



## ER Group LLC, d/b/a Engineered Rigging

Dear Figg Bridge Builders, LLC,

Just a reminder that we have not received a payment for this invoice yet. Let us know if you have questions.

Thanks for your business!
ER Group LLC, d/b/a Engineered Rigging

**DUE 05/24/2020**

# $75,431.60

Print or save

Powered by QuickBooks

ER Group LLC, d/b/a Engineered Rigging

1

**ap@engineeredrigging.com**

| | |
|---|---|
| **From:** | ER Group LLC, d/b/a Engineered Rigging <quickbooks@notification.intuit.com> |
| **Sent:** | Thursday, May 21, 2020 10:47 AM |
| **To:** | tjenkins@figgbridge.com; jrohleder@figgbridge.com; gwannin@figgbridge.com |
| **Cc:** | eddy@engineeredrigging.com; ccox@engineeredrigging.com; ap@engineeredrigging.com; gmaxwell@engineeredrigging.com; rschlyer@engineeredrigging.com |
| **Subject:** | Reminder: Invoice 1298 from ER Group LLC, d/b/a Engineered Rigging |
| **Attachments:** | Invoice_1298_from_ER_Group_LLC_dba_Engineered_Rigging.pdf |

INVOICE 1298



## ER Group LLC, d/b/a Engineered Rigging

Dear Figg Bridge Builders, LLC,

Just a reminder that we have not received a payment for this invoice yet. Let us know if you have questions.

Thanks for your business!
ER Group LLC, d/b/a Engineered Rigging

**DUE 05/25/2020**

# $67,950.00

Print or save

Powered by QuickBooks

ER Group LLC, d/b/a Engineered Rigging

4503 Stafordshire Lane Valparaiso, IN 46383

1

# EXHIBIT 7

## Christopher Cox

| | |
|---|---|
| **From:** | Rohleder, Jay <jrohleder@figgbridge.com> on behalf of Rohleder, Jay |
| **Sent:** | Thursday, July 2, 2020 9:44 AM |
| **To:** | Christopher Cox |
| **Cc:** | Figg, Linda; Phipps, Alan; Eddy Kitchen; Rob Schlyer |
| **Subject:** | RE: Cline Avenue Bridge Project - End Lease Term |

Christopher:

The payment requests should be sent to Great American Insurance Group for processing.

Please direct your request to Tim Martin. His contact information is shown below.

Regards,

Jay Rohleder

Timothy D. Martin, Divisional Vice President

Great American Insurance Group

301 East Fourth Street, 24th Floor, Cincinnati, Ohio 45202

Direct 513.579.6309 | tdmartin@gaig.com

**From:** Christopher Cox <ccox@engineeredrigging.com>
**Sent:** Tuesday, June 16, 2020 1:55 PM
**To:** Rohleder, Jay <jrohleder@figgbridge.com>
**Cc:** Figg, Linda <lfigg@figgbridge.com>; Phipps, Alan <aphipps@figgbridge.com>; Eddy Kitchen <eddy@engineeredrigging.com>; Rob Schlyer <rschlyer@engineeredrigging.com>
**Subject:** RE: Cline Avenue Bridge Project - End Lease Term

Dear Jay,

I want to keep Figg Bridge Builders, LLC (Figg) up to date on the status of the Engineered Rigging (ER) equipment leased for the Cline Avenue Bridge Project (Project) under the March 24th Lease Agreement, and the past due invoices for engineering and fabrication services related to the project.  ER has been in discussions with the company that took over the project, and they have indicated a willingness to enter into a lease for the equipment to complete the Project.  We have provided terms for their review and are waiting to hear back from them.

Under the existing lease with Figg, it is a "portal to portal" agreement, and while Figg provided notice of "ending the term for the lease agreement" in a letter dated June 3, 2020; under the Lease terms, Figg remains responsible for the equipment.  Subject to the Terms and Conditions of the Lease Agreement, rental rates continue to accrue until the equipment is returned to ER's Russellville facility; and, payment is due in advance of the term or is subject to a 5% late fee.  Under the Service Agreement, payments are net 30, and subject to a 1.5% monthly late fee.

While ER understands the challenges that Figg has with accessing the site to return the equipment as required under the Lease, ER will be enforcing its Lease and advises Figg that the following amounts are currently past due and are subject to daily penalties & interest.  Calculated below are estimates as of the date of this correspondence:

| Equipment Lease | | | 5% per mth late fee | Total |
|---|---|---|---|---|
| • Invoice 1291 | $67,950.00 | 63 days past due | $7,134.75 | $75,084.75 |
| • Invoice 1298 | $67,950.00 | 22 days past due | $2,491.50 | $70,441.50 |

| Professional Service (engineering and fabrication) | | | 1.5% per mth late fee | Total |
|---|---|---|---|---|
| • Invoice 1293 | $39,725.00 | 23 days past due | $456.84 | $40,181.84 |
| • Invoice 1294 | $14,856.54 | 23 days past due | $170.89 | $15,027.43 |
| • Invoice 1295 | $75,431.60 | 23 days past due | $729.56 | $76,161.16 |

|  | **Amount Owed:** | **$276,896.68** |
|---|---|---|

1