UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| ER GROUP, LLC d/b/a ENGINEERED RIGGING, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Cause No. 2:20-CV-426-PPS |
| FIGG BRIDGE BUILDERS, LLC and GREAT AMERICAN INSURANCE COMPANY, | ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION AND ORDER

In June 2017, Cline Avenue Bridge LLC ("CAB") chose Figg Bridge Builders, LLC as the general contractor for the construction of a bridge. Shortly thereafter, Figg purchased a payment bond from Great American Insurance, which lists Figg as principal and Great American as surety. Under this bond, Great American obligated itself to "pay for labor, materials, and equipment furnished [to Figg] for use in the performance of" the construction contract, to the extent Figg failed to pay up. For reasons that are not entirely clear, on April 7, 2020, CAB threw Figg off the job and terminated its general contract. Prior to being terminated, Figg had entered an agreement to lease equipment from ER Group. ER Group says Figg owes it $135,900 (plus interest and expenses) on that lease, which Figg has failed to pay.

On April 13, 2020, CAB entered a "Transition and Support Service Agreement" with a new contractor, Granite Construction, which covered a two-month transitional period in which Granite Construction would assist CAB with investigating, assessing,

and continuing the project. While Granite Construction apparently picked up where Figg had left off, ER Group asserts that it did not know about Figg's termination as general contractor until May 27, and did not receive written notification of Figg's termination from the project and its intent to terminate the parties' rental agreement until June 3. The equipment evidently remained on site, and on June 23, ER Group entered a new rental agreement with Granite Construction, which by that time CAB had hired on as Figg's permanent replacement.

All of this prompted ER Group, on June 24, to make a claim on the bond issued by Great American. After Great American refused payment, ER Group brought this action seeking recovery of the principal amounts due to them, plus interest and late fees, totaling $192,432.10. ER Group seeks recovery from Figg or Great American either under the terms of the rental agreement or under the payment bond.

Great American moved for summary judgment on the bond claim prior to the close of discovery. [DE 102.] After ER Group filed motions for summary judgment on both of its claims [DE 120; DE 121], I held Great American's motion in abeyance so that both motions could be addressed in a single opinion. [DE 127.] This is that opinion. For the reasons explained below, ER Group has demonstrated the absence of a triable issue as to Figg's liability under the parties' rental agreement. But there are genuine fact disputes on the issue of damages, and in particular, whether ER Group as the non-breaching party failed to mitigate. In addition, because the plain terms of the payment bond do not entitle ER Group to recover equipment rental fees for the period after

2

Figg's termination, Great American is entitled to judgment as a matter of law, and ER Group's cross-motion will be denied.

**Undisputed Facts**

As outlined above, this is essentially a collection action. The facts are tedious and largely undisputed unless otherwise noted below. ER Group, a subcontractor, seeks payment from a general contractor, Figg, and from Figg's surety, Great American. Here's what happened: on June 8, 2017, Figg and CAB entered a construction contract for the design and construction of a bridge over the Indiana Harbor and Ship Canal in East Chicago. [DE 80-3; DE 134 at 1; DE 137 at 1–2.] Figg subsequently purchased a payment bond from Great American, as surety, roughly in the amount of $110 million. [DE 80-2; DE 123-2.] We'll return to the payment bond in a moment.

In March 2020, Figg executed a written agreement with ER Group to lease equipment in connection with the bridge project. [DE 123-4.] The rental agreement sets forth monthly, weekly, and daily rental rates on the various pieces of equipment. *Id.* at 1. Under the lease, Figg agreed to lease the listed equipment for a minimum of one month commencing March 30, 2020, with "minimum rent . . . paid on demand." *Id.* at 2. Any future payments would come due "due thirty (30) days following the determination of the amount due." *Id.* Figg's initial payment was due "prior to release of equipment for shipment to [Figg]'s facility." *Id.* With respect to the daily, weekly, and monthly rates, the lease provides that "[r]ental rates are based upon monthly use not to exceed 160 hours per month," and use "beyond 160 hours shall be prorated hourly and

3

added to the base rental rate." *Id.*

The agreement incorporates a set of additional terms and conditions. They provide that the lease "begins on the date the first piece of Equipment is shipped to [Figg], and ends on the date that the last piece of Equipment is returned to [ER Group]." Following delivery to Figg, if the equipment "proves unfit for use because of accident or otherwise, [Figg]'s *sole remedy is to return the equipment and terminate this lease*. [Figg] *shall pay all rental and other amounts due prior to termination*, which shall never be less than rent due for the minimum rental period, transportation charges and costs of any repairs." *Id.* at 3 (emphasis added). The terms further state that the equipment would be loaded at ER Group's expense "F.O.B. [ER Group's] yard or other point designated by [ER Group]," and Figg would, "at its own expense, . . . do all other loading, unloading, installation, dismantling and transportation of the equipment and shall pay all other freight . . . or other transportation charges . . . from the time of loading by [ER Group] to and including the time of the equipment's return to [ER Group]." *Id.* at 5. Finally, per § 15 of the terms and conditions, ER Group may "declare this Lease is in default if" Figg fails to make any payment under the lease. *Id.*

Figg pre-paid ER Group for rental of the equipment for the period March 31 to April 27. [DE 143 at 4; DE 144 at 2; DE 115-1, ¶ 8.] ER Group shipped the equipment on March 31. [DE 123-6.] The timing was not exactly fortuitous. A little over a week later, on April 7, CAB terminated the prime construction contract and Figg lost access to the work site. [DE 123-1, ¶ 8; DE 123-9 at 3, 5; DE 134 at 4; DE 137 at 6.] After the dust

settled, a panel of arbitrators determined that CAB had insufficient grounds to terminate the agreement with Figg, and that CAB breached the agreement by failing to give Figg notice with an opportunity to cure, constituting a default of CAB's obligations under the principal construction contract. [DE 80-4 at 28–31.]

While ER Group was not a party to the arbitration and did not participate in the proceedings, Figg requested damages in the amount of $146,884 for lease equipment charges and late fees for the period April 28 to June 22. But the panel declined to award these damages to Figg. [*Id.* at 48; *see* DE 134 at 10; DE 137 at 13.] The arbitrators noted that "there was not much explanation at the hearing to substantiate entitlement for [Figg]'s] alleged post-termination damages," but concluded that the amounts claimed "do not arise from the termination and are not costs that [Figg] (or [Great American]) previously paid." [DE 80-4 at 47.] While the rental agreement does not contain any express provisions providing for termination of the lease upon written notice or in the event Figg is terminated as general contractor, the arbitrators focused on the fact that Figg had not provided "notice of the termination to [ER Group] until June 4, 2020." *Id.* at 48. The panel did not provide any further analysis of the claim in denying Figg this portion of its claimed post-termination damages.

Following CAB's termination of the construction contract, on April 13, 2020, CAB entered into a Transition and Support Service Agreement with a new general contractor, Granite Construction. [DE 123-10; DE 80-5.] The transition agreement provides that Granite Construction was being hired on to "perform 'transition services'

to aid in the prompt completion" of the bridge project," and the "anticipated duration of these services is approximately two months." [DE 123-10 at 14.] The scope of work specifically includes Granite Construction's "[c]ommunication and coordination with existing subcontractors, suppliers, vendors, and equipment rental houses." *Id.* While the transition services agreement clearly contemplated that Granite Construction would reach out to existing subcontractors following Figg's termination, again, ER Group claims that it did not learn of Figg's termination until June 2020. On June 23, ER Group entered into a new rental agreement with Granite Construction for the lease of certain rental equipment that had previously been leased to Figg and which remained at the construction site.[DE 123-15.]

On April 14, ER Group issued Invoice No. 1291 to Figg for rental equipment charges covering the period April 28 to May 25, in the principal amount of $67,950. [DE 123-7.] Then, on May 5, a second invoice—Invoice No. 1298—was sent to Figg in the same amount for charges covering the period May 26 to June 22.  [DE 123-8.] Figg admits that it has not paid these two invoices. [DE 134 at 4; *see* DE 115 at 3–4.] In an effort to collect on the unpaid invoices, ER Group made a claim on the payment bond issued by Great American in the amount of $145,321.11. [DE 123-16.]

Here's what the payment bond provides:

§ 1 The Contractor and Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference, subject to the following terms.

[DE 123-2 at 2.] "Construction Contract" refers to the construction contract between CAB and Figg. *Id.* at 3 (§ 16.2 Claimant). Great American tells me that the amount of the payment bond currently at issue is $145,321.11, representing rental charges for ER Group's equipment that "sat onsite" (what the parties call "standby costs") for the period April 28, 2020 through June 22, 2020, in the principal amount of $135,900.00, plus late fees of 5% per month. [DE 80-1, ¶ 12.] ER Group does not dispute that the principal amount of its claim currently at issue represents rental charges for its onsite equipment in the sum of $135,900.00, as reflected in its Invoice Nos. 1291 and 1298. But ER Group asserts that the amount of the claim currently at issue (as of November 17, 2023) is $192,432.10, including interest and late fees to which it is entitled, but excluding attorney's fees. [DE 123-3, ¶¶ 27–32; DE 123-19.] To date, Great American has not made payment on ER Group's bond claim. [DE 123-3, ¶ 22; DE 134 at 8; DE 137 at 13.]

As an aside, in August 2020, CAB satisfied payment for several other invoices ER Group had billed to Figg. These invoices involved fees for engineering services and material costs. [DE 80-7 (receipt of payment on Invoice Nos. 1293–1295); DE 135-1 at 4–9; *see* DE 14-6.] In August 2020, after ER Group had secured a new contract with Granite Construction, CAB agreed to make payment to ER Group in order to obtain engineering drawings ER Group had held onto following Figg's termination. [*See* DE 135-1 at 4.] In exchange, ER Group agreed to pursue "payment for unpaid rental costs ($135,900) from [Figg] and/or [Great American]" and not from CAB. *Id.* It is the recovery of those unpaid rental costs from Invoice Nos. 1291 and 1298 (plus late fees,

interest, and attorney's fees) that ER Group now seeks in this lawsuit.

The parties have submitted declarations and written correspondence providing additional detail about the timeline following Figg's termination as general contractor on April 7, 2020. Here's some of those details. On April 13, Figg's Senior VP and Project Manager William (Jay) Rohleder, Jr., emailed Robert Schlyer of ER Group, in response to Schlyer's inquiry as to "what direction the next few weeks will look like." Rohleder conveyed that Figg "was working out a contractual issue with [CAB]," and was "realistically . . . at least 4 weeks away from the possibility of having a technician on site." [DE 123-11 at 1–2; DE 135-1 at 2, ¶ 6.]

On May 27, 2020, a phone call took place between Rohleder and the President of ER Group, Christopher Cox, in which Rohleder informed Cox that Figg had been terminated by CAB as the general contractor on the bridge project. [DE 123-3, ¶ 12; DE 144 at 3.] As noted above, ER Group claims that up until that point it had not received notification that Figg had been terminated as the general contractor on the project. [DE 122 at 5.] Rohleder has submitted a declaration, in which he states that he informed Cox on May 27 that "CAB had barred Figg from the project site and that ER Group would need to come retrieve its equipment from the project site because it was impossible for Figg to return the equipment." [DE 135-1 at 2, ¶ 7.] Cox disputes this version of events in a supplemental affidavit. Cox states that he "ha[s] no recollection of Jay Rohleder making any mention of Figg being 'barred' from the . . . project site or stating that it was 'impossible' for Figg to return its rental equipment during the May

27, 2020 call." [DE 145-1, ¶ 4.]

On May 28, Cox sent an email to Rohleder and Gay Annin of Figg, advising that he had been informed that CAB had terminated Figg. Cox stated that it would be necessary to "tie up [ER Group's] contractual loose ends on the project" and identified the outstanding invoices Figg had not paid. [DE 123-3, ¶ 13; DE 123-12.] On June 3, Rohleder emailed Cox a letter providing formal "notice of ending the Cline Bridge project equipment lease." [DE 123-3, ¶ 14; DE 123-13.] The letter started with a request that ER Group "arrange with the owner [CAB] for the return of your equipment from the Cline Avenue Bridge project site," and noted that following its termination Figg "was directed to leave the site, without an opportunity to collect and return any equipment." [DE 123-13 at 2.] The letter continued, "Due to the actions of [CAB], any lease payments for the period before April 7, 2020 can be sent to [Figg] for processing. Any amounts related to the period after April 7, 2020 need to be processed through the owner, [CAB]. If [ER Group is] not satisfied with any payments received by the owner for any amounts after April 7, [ER Group] may present a written claim to [Figg] for those charges and we will use our best efforts to pass your claim through as part of our litigation against [CAB]." *Id.*

On June 16, Cox replied to Rohleder via email to "keep [Figg] up to date on the status of [ER Group's] equipment leased for the Cline Avenue Bridge Project" and the "past due invoices." [DE 123-14 at 1–2.] Cox expressed that the "existing lease with Figg" was a "'portal to portal' agreement." That meant that while Figg had provided

9

written notice ending the term of the lease agreement, per the agreement's terms, Figg remained "responsible for the equipment" until it was physically returned to ER Group, and thus rental charges and late fees would continue to accrue until the equipment was returned to ER Group's facility. *Id.* at 1. Cox continued by stating that "[ER Group] understands the challenges that Figg has with accessing the site to return the equipment as required under the lease," while emphasizing that ER Group "will be enforcing its lease[.]" [DE 123-14 at 1.] Cox separately noted that ER Group "hopes to have lease terms negotiated with the new general contractor [Granite Construction] by the end of the week," and asked Figg to advise whether it would honor the terms of the rental agreement. *Id.* at 2. If Figg did not plan to do so, ER Group would "initiate collection procedures with the surety . . . to mitigate Figg's late payment fees." *Id.*

On June 22, Cox prepared and submitted to Great American a Payment Bond Affidavit of Claim. [DE 123-3, ¶ 19; DE 123-16.] The parties exchanged written correspondence pertaining to the bond claim on July 7 and July 24. [DE 123-17; DE 123-18.] On September 3, 2020, Great American responded to ER Group's July 24 formal claim submission within the sixty-day period provided under § 7.1 of the payment bond. [DE 123-2 at 2; DE 137-2.] As noted above, Great American has not made payment to ER Group under the bond.

## Discussion

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. A motion for summary judgment has been described as the time in a lawsuit

to "put up or shut up." *Grant v. Trustees of Indiana University*, 870 F.3d 562, 568 (7th Cir. 2017). Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Great American's liability is tied to Figg's liability because a surety cannot be held liable where a principal is not. *See BMD Contractors, Inc. v. Fid. & Deposit Co. of Maryland*, 679 F.3d 643, 653 (7th Cir. 2012), *as amended* (July 13, 2012). Accordingly, I'll first take up ER Group's arguments for summary judgment against Figg based on its alleged breach of the parties' rental agreement, before evaluating the parties' cross-motions for summary judgment on ER Group's claim against Great American based on its alleged breach of the express terms of the payment bond.

## I.    Rental Agreement Claim

In this action brought under the court's diversity jurisdiction, the parties seem to agree that Indiana law applies. I'll follow suit. "Under Indiana law, the essential elements of a breach of contract action are: (1) the existence of a contract, (2) the defendant's breach thereof, and (3) damages." *BMO Harris Bank N.A. v. J-Lin Trucking, Inc.*, 2019 WL 1332174, at *3 (N.D. Ind. Mar. 25, 2019). Here's a quick distillation of the applicable state law recently penned by Judge Miller in a summary judgment order:

> Under Indiana law, "[t]he essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and

damages." *McVay v. Store House Comp.*, 289 F. Supp. 3d 892, 896 (S.D. Ind. 2017) (citing *McCalment v. Eli Lilly & Co.*, 860 N.E.2d 884, 894 (Ind. Ct. App. 2007)). The interpretation of a contract is primarily a question of law. *USA Life One Ins. Co. of Indiana v. Nuckolls*, 682 N.E.2d 534, 538 (Ind. 1997). The court's primary objective is "to give effect to the intentions of the parties as expressed in the four corners of the instrument." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 381 (7th Cir. 2001) (citing *Fetz v. Phillips*, 591 N.E.2d 644, 647 (Ind. Ct. App. 1992)). "Courts may not construe clear and unambiguous provisions, nor may it add provisions not agreed upon by the parties. *Oxford Fin. Grp., Ltd. v. Evans*, 795 N.E.2d 1135, 1142 (Ind. Ct. App. 2003).

"The meaning of a contract is to be determined from an examination of all of its provisions, not from a consideration of individual words, phrases, or even paragraphs read alone." *Art Country Squire, L.L.C. v. Inland Mortg. Corp.*, 745 N.E.2d 885, 889 (Ind. Ct. App. 2001). If the contract is "clear and unambiguous, then it should be given its plain and ordinary meaning." *USA Life One Ins. Co. of Indiana v. Nuckolls*, 682 N.E.2d 534, 538 (Ind. 1997). A "contract term is not ambiguous merely because the parties disagree about the term's meaning." *Roy A. Miller & Sons, Inc. v. Industrial Hardwoods Corp.*, 775 N.E.2d 1168, 1173 (Ind. Ct. App. 2002). "An ambiguity exists only where reasonable people could come to different conclusions about the contract's meaning." *Id.*; *see also Abbey Villas Dev. Corp. v. Site Contrs., Inc.*, 716 N.E.2d 91, 100 (Ind. Ct. App. 1999) ("A contract is ambiguous when it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning.").

*Norfolk S. Ry. Co. v. Glob. Tower, LLC*, 620 F. Supp. 3d 784, 797 (N.D. Ind. 2022).

ER Group tells me this is a "simple breach of contract case" and asserts that it is entitled to judgment as a matter of law because there is no genuine triable dispute as five facts: *First*, ER Group entered into the rental agreement with Figg; *second*, it shipped and delivered the equipment to Figg on March 31, 2020; *third*, Figg has failed to pay for the period April 28 to June 22; *fourth*, ER Group entered an equipment lease agreement with Granite Construction effective June 23, 2020; and *fifth*, Figg has not returned the

12

rental equipment to ER Group. [DE 124 at 5.] ER Group also seeks partial summary judgment on each of Figg's twelve affirmative defenses. *Id.* at 7–14.

In response, Figg's main argument is that there is a genuine dispute as to whether its ability to perform per the terms of the lease agreement (namely, to return the equipment) became impossible through no fault of its own after it was wrongfully terminated by CAB on April 7. [DE 133 at 5–6.] Figg also argues that, in the alternative, the fact that the rental agreement calls for rates on a daily, weekly, or monthly basis means that it is "severable into components" and therefore there is a triable dispute as to whether its liability under the rental agreement ceased when it provided written notice of termination on June 3. *Id.* at 6–7. Finally, Figg makes a smattering of arguments in support of its other defenses based on failure to state a claim, waiver, estoppel, failure to sue the proper defendant, that its conduct was not the proximate cause of ER Group's alleged damages, and failure to mitigate damages. *Id.* at 7–10.[1]

As summarized above, § 1 of the rental agreement's "Terms and Conditions" provides that the equipment lease "begins on the date the first piece of Equipment is shipped to [Figg Bridge], and ends on the date that the last piece of Equipment is returned to [ER Group]." [DE 123-4 at 3.] In other words, the agreement is silent as to termination by written notice and explicitly provides that it "ends on the date the last piece of Equipment is returned to [ER Group]." Following delivery, if the equipment "proves unfit for use because of accident or otherwise, [Figg]'s *sole remedy is to return the*

---

[1] Figg agrees that its remaining affirmative defenses (the second, fifth, sixth, and eleventh) are baseless and "that summary judgment should be entered on those defenses." *See id.* at 10.

*equipment and terminate this lease.* [Figg] *shall pay all rental and other amounts due prior to termination,* which shall never be less than rent due for the minimum rental period, transportation charges and costs of any repairs." *Id.* (emphasis added). The terms further state that the equipment would be loaded at ER Group's expense "F.O.B. [ER Group's] yard or other point designated by [ER Group]," and Figg shall, "at its own expense, . . . do all other loading, unloading, installation, dismantling and transportation of the equipment and shall pay all other freight . . . or other transportation charges . . . *from the time of loading by [ER Group] to and including the time of the equipment's return to [ER Group].*" *Id.* at 5 (emphasis added).

The undisputed facts reflect that Figg and ER Group entered into an equipment lease that unambiguously commenced on the date the equipment was shipped to Figg and "end[ed]" on the date the last piece of equipment was "returned" to ER Group. The equipment was sent to Figg per its terms and there is no dispute that Figg failed to return the equipment to ER Group. ER Group has demonstrated that Figg is in breach of the lease because payments are due under the lease term and, to date, Figg has not made payment. Therefore, in ER Group's telling, it's a simple case.

ER Group is correct as it relates to liability—it is an easy case. But the story does not strike me as being quite so clear—at least as it relates to damages. I'll return to the issue of damages in a moment. But first, I need to consider Figg's affirmative defenses and whether they require a trial. "At any stage of a proceeding, the defendant bears the burden of raising and proving its affirmative defenses." *Pantry, Inc. v. Stop–N–Go Foods,*

*Inc.*, 796 F.Supp. 1164, 1167 (S.D. Ind. 1992). In order to survive summary judgment, "[a]

defendant—who bears the burden of proof at trial on the affirmative defenses—must

put forth sufficient evidence to create an issue of fact on the affirmative defenses."

*Bethine W. Alberding Est. Admin. Tr. ex rel. Moore v. Vinoy Park Hotel Co.*, 2005 WL 730960,

at *3 (N.D. Ill. Mar. 24, 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324  (1986);

*Springfield Oil Services, Inc. v. Mermelstein*, 914 F.Supp. 258, 264 (N.D. Ill. 1996)).

Figg's first argument is that it was impossible for it to perform the lease terms

and therefore it is not liable for any damages ER Group may have suffered.

Impossibility is an affirmative defense to a breach of contract claim. *Noble Roman's, Inc.*

*v. AMI Stores Mgmt., Inc.*, 2023 WL 5607975, at *7 n.9 (S.D. Ind. July 25, 2023) (citing

*Wagler v. W. Boggs Sewer Dist., Inc.*, 980 N.E.2d 363, 378 (Ind. Ct. App. 2012)).

Accordingly, Figg bears the burden of establishing a genuine triable dispute as to the

impossibility of its performance. *BRC Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 949 F.

Supp. 2d 862, 875 (N.D. Ind. 2013) (citing *Alexander v. Unlimited Progress Corp.*, 2004 WL

2384645, at *4 (N.D. Ill. Oct. 20, 2004).

ER Group initially pushes back on this defense with a procedural wrinkle: Figg

did not raise impossibility of performance as an affirmative defense in its answer and

has not sought leave to amend it. [*See* DE 17 at 10–12.] Figg responds that it pled facts

putting ER Group on notice of its impossibility defense and therefore the defense was

not forfeited, even if none of its affirmative defenses are specifically styled with the

magic words "impossibility of performance." *See id.* Figg points me to the ninth

affirmative defense, which states that after Figg's wrongful termination, the construction site and possession of ER Group's equipment was in the care, custody, and control of CAB and its replacement contractor. *Id.* at 11.

During the post-termination period, Figg claims, only the owner and replacement contractor had the authority or ability to release ER Group's equipment, and they both required use of the equipment to complete the project. *Id.* at 12. The affirmative defense adds that following Figg's termination, ER Group entered into a subcontract with the replacement contractor. "Apparently, [ER Group] failed to include in the subcontract any compensation for the owner's use of the equipment during the post-termination period" – and that "failure" on ER Group's part "amounts to a failure by [ER Group] to mitigate the damages sought in the lawsuit." *Id.* at 12. It ends by stating that "[a]s a result of [ER Group's] failings, as set forth above, [ER Group] is estopped from asserting damages during the post-termination period." *Id.*

This affirmative defense does not paint anything close to a portrait of clarity. But based on the legalese framed around the facts alleged, it could reasonably be read to raise defenses of estoppel, failure to mitigate damages, or impossibility. Although Figg's pleading was murky, I am unpersuaded by ER Group's argument that it has suffered unfair surprise and prejudice and that I should therefore deem the argument forfeited. *See Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 478 (7th Cir. 2019) ("The purpose of the pleading requirement for an affirmative defense is to avoid surprise and undue prejudice to the plaintiff by providing her notice and the opportunity to

demonstrate why the defense should not prevail."). *See also Burton v. Ghosh*, 961 F.3d 960, 965 (7th Cir. 2020) (same). The fact that Figg was terminated and banned from the site are allegations that are sufficient to make out a "short and plain statement" of facts supporting an affirmative defense of impossibility. *See* Fed. R. Civ. P. 8(a)(1), (c). *See also Huizar v. Experian Info. Sols.*, 2023 WL 195834, at *2 (N.D. Ind. Jan. 17, 2023).

In all events, the issue of waiver is neither here nor there, because, getting to the substance of the defense, I am unpersuaded that Figg has demonstrated a triable dispute as to impossibility of performance. That is because the standard for this defense under Indiana law is exceedingly high, as the state courts have explained:

> Impossibility has been defined as "where the performance of a contract becomes impossible, non-performance is excused, and no damages can be recovered." *Dove v. Rose Acre Farms, Inc.*, 434 N.E.2d 931, 935–936 (Ind.Ct.App.1982). To invoke impossibility, one must demonstrate that performance is "not merely difficult or relatively impossible, but absolutely impossible, owing to the act of God, the act of the law, or the loss or destruction of the subject-matter of the contract." *Ross Clinic, Inc. v. Tabion*, 419 N.E.2d 219, 223 (Ind. Ct. App. 1981) (quoting *Krause v. Bd. of Trustees of Sch. Town of Crothersville*, 162 Ind. 278, 283–284, 70 N.E. 264, 265 (1904)).

*Wagler*, 980 N.E.2d at 378. *See also Doman v. Heartland Recreational Vehicles, LLC*, 2023 WL 6637619, at *5 (N.D. Ind. Oct. 12, 2023) ("Impossibility presumes an extraordinary and unpreventable event.") (citing *Krause*, 353 N.E.2d at 527–28).

Figg cites *Wagler*, which equates impossibility of performance to circumstances making performance "absolutely impossible," like an "act of God," the force of law, or "the loss or destruction" of the subject matter of the contract. From this, Figg baldly argues that evidence that it was "barred" from the project site on April 7 means it "lost

17

the subject matter of the Lease Agreement (the leased equipment)." [DE 133 at 6.]

The argument borders on frivolous. First, what happened here wasn't an "act of God" or an "act of the law" (*i.e.*, a provision of law made its performance unlawful). *See, e.g.*, *Wagler*, 980 N.E.2d at 378 (rejecting argument that performance of terms of agreed order to connect to sewer system was impossible to perform based on state and federal laws protecting freedom of religion); *Gregg School Township v. Hinshaw*, 132 N.E. 586 (Ind. Ct. App. 1921) (applying defense of impossibility to dismiss teacher's claim for lost wages where school was closed by health authorities due to an epidemic). Nor was there a "loss or destruction of the subject matter of the contract" that made performance impossible. *See, e.g.*, *Doman*, 2023 WL 6637619, at *5 (finding "the total destruction of [plaintiffs'] RV no doubt fits the description of 'loss or destruction of the subject-matter of the contract'"); *Hipskind Heating & Plumbing Co. v. Gen. Indus., Inc.*, 246 Ind. 215, 204 N.E.2d 339, 216 (1965) (subject of contract was destroyed by fire).

After granting it leave to file a sur-reply, Figg has not presented any authorities suggesting that the fact that it lost present possession of the rental equipment and could not access it without permission from a property owner or its agent, standing alone, creates a genuine dispute that it was "impossible" for it to return the equipment to ER Group. Indeed, there is scant evidence that Figg even attempted to do so. And there is no evidence that it was rebuffed in any such effort, beyond Rohleder's belief that it had been "barred" from the work site. What's more, it certainly wasn't "impossible" for Figg to seek an injunction from a court allowing entry to the property to retrieve the

18

construction equipment it was responsible for. But there is no evidence it made that effort either. In sum, the threadbare arguments before me do not establish a triable issue on Figg's defense of impossibility of performance.

Figg next argument is that because the lease includes charges for daily, weekly, and monthly rates, it is a "severable contract" and therefore Figg's liability "terminated when notice was provided to ER Group" via Rohleder's June 3 letter. [DE 133 at 7.] Indiana courts assess the severability of a contract by considering "the entirety or divisibility of the consideration; and whether a contract is entire or divisible is controlled by the intention of the parties as it is disclosed by the terms of the contract." *Heritage Dev. of Indiana, Inc. v. Opportunity Options, Inc.*, 773 N.E.2d 881, 891 (Ind. Ct. App. 2002) (quoting *Samper v. Indiana Dept. of State Revenue*, 231 Ind. 26, 106 N.E.2d 797, 802 (1952)).

The contract does call for different rates for different periods of time, but I struggle to see how that obviates the express provision in the agreement providing for termination only upon the return of the equipment to ER Group. A more commonsense reading of the contract is that the rates are included to facilitate charges for less than a full month of fees (*i.e.*, in days or weeks or a combination of the two) if a rental is returned during a thirty-day period. In context, this provision does not reflect the intent of the parties to permit severability of the lease term at the proscribed rates upon written notice. It would be unreasonable to read this language in isolation to rewrite the express termination and penalty provisions in the agreement. *Accord Manzon v. Stant*

*Corp.*, 202 F. Supp. 2d 851, 857 (S.D. Ind. 2002) ("This court will not construe clear and unambiguous provisions, nor will we add provisions not agreed upon by the parties.") (applying Indiana law).

What about Figg's other affirmative defenses? While ER Group has come forth with citations to case law in support of its arguments that each argument fails in light of the undisputed facts in the record, Figg takes a different tack—writing a narrative of its view of the facts, without addressing any elements of the asserted defenses, and baldly asserting that it has met its burden to proceed to trial. [*See* DE 133 at 8–10.] Not a single case is cited over the two pages of narrative.

Initially, while it's "not settled within in the Seventh Circuit," courts have held that failure to state a claim upon which relief can be granted (Figg's first affirmative defense) is not really an affirmative defense at all because "the proper vehicle for a party to establish a failure to state a claim is a Rule 12(b)(6) motion." *Raquet v. Allstate Corp.*, 348 F. Supp. 3d 775, 785 (N.D. Ill. 2018); *Illinois Wholesale Cash Register, Inc. v. PCG Trading, LLC*, No. 08 C 363, 2009 WL 1515290, at *2 (N.D. Ill. May 27, 2009). Figg concedes that this affirmative defense is an accumulation of its arguments opposing summary judgment on the basis of its other affirmative defenses. [DE 133 at 7.] I'll take the same course as *Allstate Corp.* and *Illinois Wholesale* and grant ER Group partial summary judgment on this defense, which Figg acknowledges is essentially duplicative of its other defenses.

Figg's affirmative defenses based on waiver fails, as well. Indiana law recognizes

that parties may waive legal rights, including "giving up the right to treat the contract as breached by the other party." *Bobeck Real Est. Co. v. Frontier N. Inc.*, 120 F. Supp. 3d 845, 854 (N.D. Ind. 2015) (quoting *Waxman Indus., Inc. v. Trustco Dev. Co.*, 455 N.E.2d 376, 378 (Ind. Ct. App. 1983)). Waiver requires an "affirmative act" and cannot be shown by "mere silence, acquiescence, or inactivity . . . unless there was a duty to speak or act." *Pohle v. Cheatham*, 724 N.E.2d 655, 659 (Ind. Ct. App. 2000). There is no evidence suggesting that ER Group ever knowingly relinquished its rights under the rental agreement. And Figg does not cite any evidence suggesting otherwise.

Figg argues that because ER Group "chose to forego the opportunity to obtain repayment [from CAB or Granite Construction] for the rental equipment, it waived its right" to enforce the rental agreement against Figg. *Id.* at 8–9. ER Group engaged with CAB and Granite to get paid for engineering work and it appears it could have also negotiated a payment for the rental costs incurred from April 28 to June 22 while assisting in Figg's demobilization. And it certainly obtained a new subcontract with Granite Construction. But none of the correspondence concerning that side agreement reflects that ER Group intended to waive its rights under its lease with Figg. To the contrary, ER Group agreed to pursue the rental costs from Figg and Great American. [DE 135-1 at 4, 7.] Moreover, Cox had previously reiterated the company's intention to enforce the lease's terms and conditions after issuing the invoices for rental fees covering the period through June 22, even after receiving Rohleder's June 3 letter requesting that ER Group "arrange with [CAB] for the return of your equipment from

21

the . . . project site." [DE 123-13 at 2; *see* DE 123-14 at 1.] In sum, while the fact that ER

Group may have received some funds from Granite for outstanding engineering costs

during the operative period is germane to damages, it's not proof of waiver, and it's

immaterial to the issue of liability.

As for the defense of estoppel, it is "a judicial doctrine sounding in equity; the

doctrine essentially provides that one who by deed or conduct has induced another to

act in a particular manner will not be permitted to adopt an inconsistent position,

attitude, or course of conduct that causes injury to such other.'" *Bobeck Real Est. Co.*, 120

F. Supp. 3d at 854 (internal quotation omitted). *See also Brown v. Branch*, 758 N.E.2d 48,

51–52 (Ind. 2001). For a party to be equitably estopped from seeking damages in a

breach of contract action, there must be a showing of several elements, including (1) a

false representation or concealment of material facts made with knowledge, actual or

constructive, of the facts; (2) the party to whom it was made must have been without

knowledge or the means of knowledge of the real facts; (3) the representation or

concealment must be made with the intention that it should be acted on; and (4) the

party to whom it was made must have relied on or acted on it to his prejudice. *City of

New Albany v. Cotner*, 919 N.E.2d 125, 133 (Ind. Ct. App. 2009) (citing *Ebersol v. Mishler*,

775 N.E.2d 373, 378 (Ind. Ct. App. 2002)).

In an effort to turn the tables, Figg argues that ER Group should be "estopped"

from claiming damages because ER Group itself "retained possession of [Figg's] owned

equipment and made use of it without compensating [Figg]." [DE 133 at 10.] Perhaps

this is true. Who knows? But if it is true, why was there no counterclaim filed in this

case? What is beyond question is that any alleged action by ER Group in unlawfully

retaining Figg's property is *entirely unsupported by the evidence in this case* and, in any

event, it is not the subject of this case. Therefore, ER Group is entitled to judgment on

Figg's estoppel defense.

There is also no merit to Figg's argument that it is not liable for breach of the

rental agreement because ER Group failed to sue the "proper defendants." Figg argues

that ER Group chose not to join "necessary defendants" to the case, namely CAB and

Granite Construction, and has thus "lost the right to collect from [Figg] because the

parties truly responsible for the unpaid rent are not parties to the case." *Id.* at 9. "In

Indiana, a suit for breach of contract may be brought only against 'a party to the

contract or against those in privity with the party.'" *Heston v. Int'l Med. Grp., Inc.*, 528 F.

Supp. 3d 963, 970 (S.D. Ind. 2021) (quoting *Broadhurst v. Moenning*, 633 N.E.2d 326, 334

(Ind. Ct. App. 1994)). It's undisputed that Figg, and not CAB or Granite Construction or

any other party, was the lessee on the rental agreement. Figg does not even address this

point in its briefing. If Figg reasonably believed that some other party was the proper

defendant on the claim, it was free to file a third-party action against that party. But it

never attempted to do so and cannot seek to avoid summary judgment by pointing the

finger at another party it has not attempted to join in the suit.

That leaves Figg's "defense" that ER Group failed to mitigate damages. Figg

argues (without citing any applicable case law) that there is a triable issue precluding

judgment because CAB's wrongful termination was the cause-in-fact of Figg's "inability to return the rental equipment," and thus the "proximate cause of ER Group's alleged damages was CAB's wrongful termination . . . , not any alleged failure on the part of [Figg] to return the equipment." [DE 133 at 9.] This argument confuses the concept of proximate cause with but for cause. What's more, failure to mitigate is not an affirmative defense to liability. *Buhring v. Tavoletti*, 905 N.E.2d 1059, 1064 (Ind. Ct. App. 2009) (citing *Willis v. Westerfield*, 839 N.E.2d 1179, 1187 (Ind. 2006)). The Indiana Supreme Court has explained that "the duty to mitigate damages is a common law duty independent of the contract terms that requires the non-breaching party to make reasonable effort to act in such a manner as to decrease the damages caused by the breach." *Fischer v. Heymann*, 12 N.E.3d 867, 871 (Ind. 2014) (internal quotations and citations omitted).

A failure to mitigate may serve to reduce the amount of damages a plaintiff is entitled to recover after a finding of liability. *Buhring*, 905 N.E.2d at 1064. The burden of proving a failure to mitigate falls on the breaching party (here, Figg). *Fischer*, 12 N.E.3d at 871 (internal quotations and citation omitted). The problem from my point of view is that ER Group has made the issue of damages binary. In its telling, they should be awarded all of its damages. But while ER Group certainly has a right to damages for Figg's breach, it cannot "be placed in a better position than [it] would have been in if the contract had not been broken." *Id.* What's more, Figg can "only be found liable . . . on the contract for an amount of damages which can be said to be the natural and

24

proximate consequences of the breach[.]" *Finley v. Chain*, 176 Ind. App. 66, 76, 374 N.E.2d 67, 76 (1978), *overruled on other grounds by Morris v. Weigle*, 270 Ind. 121, 383 N.E.2d 341 (1978).

What is plain is that no later than receiving Rohleder's letter on June 3 did ER Group know that Figg had been terminated as general contractor and could not access the work site. (Whether it was even earlier than June 3 is a fact question.) While it is undisputed that the equipment was never returned to ER Group per the terms of the rental agreement, it is hard to swallow ER Group's claim for full damages as a result. On the contrary, it seems entirely reasonable to conclude that ER Group tangibly benefitted from having the equipment stay on the work site to be employed in the *very same construction project* albeit with a new general contractor that ER Group hoped to support—and of course, ultimately did support. Am I supposed to believe that Figg harmed ER Group by leaving the equipment on the work site, rather than hauling it back to ER Group's facility (assuming it was even possible for Figg to do so)—only to have ER Group send it right back to the site for use by the new general contractor? That's not sensible.

In sum, for the reasons stated above, it is clear that Figg is in breach of the agreement, and ER Group is entitled to summary judgment in its favor on the issue of liability. But the record reflects genuine disputes about whether ER Group mitigated its damages and whether Figg's breach caused all of the damages that ER Group seeks. The issue of damages owed to ER Group therefore will have to be decided at trial.

## II.    Payment Bond Claim

Let's turn now to ER Group's second claim for breach of contract under the terms of the payment bond Great American issued to Figg. The bond does not specify that Indiana law governs to any suits brought to enforce its terms—but it does provide that no "suit or action" may be commenced by a qualifying "claimant" under the bond "other than in a court of competent jurisdiction in the state in which the project that is the subject of the Construction Contract is located[.]" [DE 123-2 at 3; DE 125 at 3 n.1.] Once again, the parties appear to agree that Indiana law applies, and the project forming the subject of the construction contract secured by the payment bond was located in Indiana. Accordingly, I will also apply Indiana contract law to interpret the terms of the payment bond.

The contract I am asked to construe, the payment bond, is a surety contract. These types of agreements create a "tripartite relation between the party secured, the principal obligor, and the party secondarily liable, and the rights, remedies, and defenses of a surety cannot be disassociated from this relationship." *BMD Contractors, Inc. v. Fid. & Deposit Co. of Maryland*, 679 F.3d 643, 653 (7th Cir. 2012), *as amended* (July 13, 2012) (quoting *Meyer v. Bldg. & Realty Serv. Co.*, 196 N.E. 250, 253 (Ind. 1935)). As surety, Great American must "answer for the debt, default, or miscarriage of another," and "cannot be liable where the principal is not." *Id.* These agreements are construed strictly against the surety, and any ambiguities are resolved in favor of the party secured by the payment bond. *Id.* (citing *Garco Indus. Equip. Co., Inc. v. Mallory*, 485 N.E.

26

2d 652, 654 (Ind. Ct. App. 1985)).

Turning to the relevant terms, the payment bond lists Figg Bridge as principal and Great American as surety. Section 1 states that Figg Bridge and Great American, "jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to [CAB] to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract," which is incorporated by reference in § 16.3 ("Construction Contract"). [DE 123-2 at 1–3.] Great American's obligation to a subcontractor (here, ER Group) is triggered when the subcontractor sends a claim to Great American. *Id.* at 2–3 (§§ 5, 5.2, 16.2). When a claim is made, Great American must answer it, identify any disputes, and arrange for payment of any undisputed amounts. *Id.* at 2 (§§ 7, 7.1, 7.2).

The contract defines "labor, materials or equipment" to "include without limitation . . . *that part* of . . .  rental equipment used in the Construction Contract, architectural and engineering services *required for performance of the work* of [Figg Bridge] and [its] subcontractors, and all other items for which a mechanic's lien may be asserted in the jurisdiction where the labor, materials or equipment were furnished." *Id.* at 3 (§ 16.2) (emphasis added). Again, per § 1, the "labor, materials and equipment" must be "furnished for use in the performance of the Construction Contract," as opposed to *all* labor, materials, and equipment a subcontractor could conceivably recover on a mechanic's lien. *Id.* at 2.

ER Group argues it is undisputed that the equipment would be sent to and

located at the Cline Avenue Bridge project site, and all agree this in fact happened prior to the termination of Figg. Therefore, the argument goes, the equipment was "furnished for use in the performance of the construction contract," notwithstanding the fact that Figg never used it after April 7. [DE 125 at 4–5; DE 142 at 2.]

ER Group bases its position in large part on a separate case in this district, in which Judge Van Bokkelen evaluated the same payment bond at issue in this dispute. *See McLean Contracting Co. v. Great Am. Ins. Co.*, Cause No. 2:20-CV-439-JVB-JEM, 2023 WL 3618847 (N.D. Ind. May 24, 2023). For its part, Great American argues that the language is clear on its face: any work performed by ER Group following termination of the prime construction contract is not, by definition, "furnished for use in the performance of the Construction Contract," and is thus unrecoverable. [DE 78 at 4; DE 116 at 2–3; *see* DE 136.]

In *McLean*, Judge Van Bokkelen denied Great American summary judgment on a claim made by another of Figg Bridge's subcontractors, finding that the contractor had incurred standby costs to enable Figg Bridge to perform its contract with CAB, kept its workers and equipment available "in good faith," and a reasonable jury could decide that some or all of the contractor's standby costs incurred after Figg Bridge's termination on April 7, 2020 were provided "for use in furtherance of Figg performing on the construction contract." *Id.* at *6. The court reasoned that the "impossibility of Figg actually using what was furnished for the intended purpose is not determinative" to Great American's obligations to pay up for equipment and services furnished to Figg

Bridge with the intention that they be used in its work on the construction contract. *See id.* at *4–*6. Judge Van Bokkelen provided an amusing analogy summarizing this view of the "furnished for use in" language in the contract: a person could furnish a bag of cat food to a cat owner for the purpose of providing food to the cat. *Id.* at *5. The fact that the cat died unbeknownst to the person who sent the cat food does not mean that the food was not furnished for use in feeding the cat. *Id.*

In opposing Great American's motion for summary judgment and moving affirmatively for summary judgment on the bond claim, ER Group asserts that Judge Van Bokkelen's analysis "is on point and equally applicable here." [DE 112 at 2; *see* DE 125 at 4, 7–9.] Great American, for its part, argues that *McLean* "misinterpreted the payment bond by failing to consider the 'furnished for use' language in the context of the entire bond." [DE 136 at 10; *see* DE 78 at 2, 4, 6.] Great American also points out that this analogy doesn't really speak to the key question of who would be liable to pay for the cat food. [DE 116 at 8–9; 136 at 10–11.] Accepting the analogy at face value, in the context of the surety agreement before me, the inquiry is really whether a surety that guaranteed payment for cat food (*i.e.*, the equipment) furnished to feed a specific cat (*i.e.*, the general contractor, Figg Bridge) is liable if the bonded cat died unbeknownst to the provider of the cat food (*i.e.*, Figg Bridge is subsequently terminated as general contractor) or the food is fed to a different cat (*i.e.*, the equipment remained on site and was used by a replacement general contractor, Granite Construction). In other words, the analogy doesn't really address what I view as the key question at hand: what effect

29

(if any) the termination of the underlying construction contract has on Great American's obligations to "pay for the cat food," so-to-speak.

The issue rises and falls on construction of the bond, which is a "question of law for the trial court" and thus "particularly appropriate" for disposition at summary judgment. *Bachman v. AMCO Ins. Co.*, 897 F. Supp. 2d 780, 786 (N.D. Ind. 2012) (citing *Plumlee v. Monroe Guar. Ins. Co.*, 655 N.E.2d 350, 354 (Ind. Ct. App. 1995)). As signatories to the bond, Figg and Great American bound themselves "to the Owner [CAB] to pay for labor, materials and equipment furnished for use in the performance of the construction contract." [DE 123-2 at 2, § 1.] As a district court explained in unpacking "the rules of bond interpretation," the whole point of obtaining a bond in this context "is to protect [the obligee; here, CAB] from mishap," which could ensue if an obligor (here, Figg) "defaulted as to its []sub-contractors," meaning that CAB "would need to make sure that they were paid so that construction on the project as a whole could proceed without stoppage." *See Paige Int'l, Inc. v. XL Specialty Ins. Co.*, 267 F. Supp. 3d 205, 214 (D.D.C. 2017).

Here, similarly, the bond states that Great American's obligation is to "defend, indemnify, and hold harmless the Owner [CAB] against a duly tendered claim, demand, lien, or suit" by "any person or entity seeking payment for labor, materials or equipment furnished for use in the performance of the Construction Contract." [DE 123-2 at 2, §§ 3, 4.] This obligation goes hand in hand with Figg's duty, under the construction contract, to obtain a payment bond to protect CAB from claims and

30

mechanic's liens from unpaid subcontractors. [DE 80-3, ¶ 4.19.1.] ER Group stands as a third party to the surety agreement. The duties owed to third parties under such agreements "are not essential to the suretyship structure," and indeed such an agreement "need not include *any* third-party beneficiaries at all." *Paige Int'l*, Inc., 267 F. Supp. 3d at 216. Thus, Great American's duty to pay up to third parties like ER Group "rises and falls on bargained-for provisions of the given bond." *Id.*; *see also id.* at 214 (noting scope of liability "must be measured by the conditions stated in the bond").

The terms of the bond bind Great American, "jointly and severally . . . to the Owner [CAB]." [DE 123-2 at 2, § 1.] ER Group contends that Great American is liable for Figg's payment obligations arising under the subcontract. [*See* DE 125 at 7.] But that ignores that the same provision in the bond states that Great American agreed to be bound "to the Owner [CAB]"—and only to the extent there "[i]s no Owner Default under the Construction Contract." As prefaced, ER Group bases nearly all of its argument on the language in § 1 of the bond ("equipment furnished for use in the performance of the Construction Contract"), asserting that it plainly covers rental fees and related costs for equipment that was undisputedly furnished to Figg for use in the project prior to Figg's termination on April 7. But as Great American points out, other language in the bond makes it clear that "[t]he intent of this Bond shall be to include without limitation in the terms 'labor, materials or equipment' *that part of . . . rental equipment used in the Construction Contract*[.]" [DE 123-2 at 3, § 16.2 (emphasis added).] Adding to this, § 10 states that Great American "shall not be liable . . . for obligations of

the Contractor [Figg] that are *unrelated to the Construction Contract*," reiterating that the whole point of claimants furnishing equipment for use in the construction contract is that the equipment actually be used in Figg's performance of *that* "Construction Contract," not the bridge project more generally.

As I read it, § 16.2 unambiguously limits the scope of liability under the bond to claims for "that part of" rental equipment costs "used in the Construction Contract." ER Group argues that it should be read as a catchall clause to include subcontractors "who did not have a contract with the prime contractor or a subcontractor [who] supplied the enumerated utilities/equipment that were used in the Construction Contract." [DE 142 at 6.] This interpretation strains the language of the contract, insofar as it suggests that the parties intended to more narrowly define liability as certain subcontractors to "that part" of the equipment provided that were actually used in the contract, while allowing anyone with a direct agreement with Figg to seek recovery for *any* fees that racked up after the equipment was furnished "for use" in the project. It seems perfectly clear that, contrary to ER Group's arguments, the payment bond did condition liability on whether the equipment was actually used in the construction contract, albeit not in § 1, but rather in § 16.2. The contrary interpretation pressed by ER Group would render the inclusion of the limiting language "that part" in § 16.2 mere surplusage and unduly expand the surety's obligations to encompass costs for equipment that could not possibly be used for performance of the bonded construction contract at issue after an owner's default. While I have great respect for Judge Van Bokkelen, it appears he did

not consider these points in his analysis of the bond in *McLean.*

In sum, because the unambiguous language in the payment bond does not encompass the equipment costs ER Group seeks to recover, Great American is entitled to judgment on ER Group's claim for breach of the payment bond.

**ACCORDINGLY:**

Plaintiff ER Group, LLC's Motion for Summary Judgment Against Figg Bridge Builders, LLC [DE 120] is **GRANTED IN PART**. With the exception of failure to mitigate damages, for the reasons explained in this Opinion and Order, ER Group is entitled to judgment on the balance of Figg's affirmative defenses, and they are hereby **DISMISSED WITH PREJUDICE**. ER Group has demonstrated the absence of a triable issue as to Figg's liability under the parties' rental agreement. However, there are genuine fact disputes precluding judgment on ER Group's breach of contract claim, at least as to amount of damages.

Defendant Great American Insurance Company's Motion for Summary Judgment [DE 102] is **GRANTED**, and ER Group's cross-motion for summary judgment [DE 121] is **DENIED**.

**SO ORDERED**.

ENTERED: March 27, 2024.

 /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT