UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| ER GROUP, LLC d/b/a ENGINEERED RIGGING, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Cause No. 2:20-CV-426-PPS ) |
| FIGG BRIDGE BUILDERS, LLC and GREAT AMERICAN INSURANCE COMPANY, | ) ) ) ) ) |
| Defendants. | ) ) |

## OPINION AND ORDER

This is a contract dispute arising from the construction of a bridge over the Indiana Harbor and Ship Canal in East Chicago. Plaintiff ER Group, a subcontractor, sued Figg Bridge Builders, the general contractor for the construction of the bridge, for unpaid invoices. ER Group also sought to collect from Figg's surety, Great American Insurance Company.[1] On March 27, 2024, I granted in part ER Group's motion for summary judgment. In sum, I found that ER Group demonstrated the absence of a triable issue as to Figg's liability under the terms of the parties' equipment rental agreement, but that genuine fact disputes regarding the amount of damages precluded judgment on the claim. [DE 153.] I further concluded that Great American was entitled to judgment on the payment bond claim, and so I dismissed Great American from the case. *Id*.

---

[1]Subject matter jurisdiction in this case is based on diversity of citizenship. [DE 1.]

A bench trial followed on July 23, 2024 limited to the issue of what damages were owed to ER Group from Figg and whether ER Group acted reasonably in attempting to mitigate its damages. [DE 182; DE 183; DE 184.] ER Group and Figg have submitted proposed findings of fact and conclusions of law. [DE 171; DE 172.] Having considered the parties' arguments and the evidence submitted, I now make the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any finding of fact is deemed to be a conclusion of law, it is incorporated as such, and vice versa.

## Findings of Fact

On June 8, 2017, Figg, as general contractor, entered into a contract for the design and construction of a bridge over the Indiana Harbor and Ship Canal in East Chicago, Indiana for the owner, Cline Avenue Bridge, LLC which I'll refer to as "CAB". [DE 164 at 5–6.] On March 4, 2020, ER Group and Figg entered into a separate agreement for ER Group to provide professional engineering services to design a Cantilever Segment Bridge Lift for the project and field technical assistance to supervise the assembly of the bridge lift according to the design plans, as well as to monitor safe use of all related equipment used with lifting bridge segments into their permanent location. [Pltf. Exh. 1.][2] The same day, ER Group and Figg entered a purchase agreement, under which Figg agreed to purchase custom fabricated parts for the bridge lift. [Pltf. Exh. 2.]

---

[2] In referencing exhibits tendered by the parties, I will uniformly cite to Plaintiff's admitted exhibits as "Pltf. Exh. #," and Defendant's admitted exhibits as "Def. Exh. #," as these documents have not been electronically filed on the docket.

Most importantly, at least for present purposes, the pair on March 4, 2020 also entered a rental agreement, pursuant to which Figg leased equipment it needed to operate the bridge lift. [DE 14-2.][3] The rental agreement sets forth monthly, weekly, and daily rental rates on the various pieces of equipment. Under the lease, Figg agreed to lease the listed equipment for a minimum of one month commencing March 30, 2020, with "minimum rent . . . paid on demand." Any future payments would come "due thirty (30) days following the determination of the amount due," and Figg's initial payment was due "prior to release of equipment for shipment to [Figg]'s facility." With respect to the daily, weekly, and monthly rates, the lease provides that "[r]ental rates are based upon monthly use not to exceed 160 hours per month," and use "beyond 160 hours shall be prorated hourly and added to the base rental rate." *Id*. at 3.

The agreement incorporates a set of additional terms and conditions. [DE 14-2.] For example, the lease agreement was portal to portal. In other words, it began "on the date the first piece of Equipment is shipped to [Figg], and ends on the date that the last piece of Equipment is returned to [ER Group]." Following delivery to Figg, if the equipment "proves unfit for use because of accident or otherwise, [Figg]'s sole remedy is to return the equipment and terminate this lease. [Figg] shall pay all rental and other amounts due prior to termination, which shall never be less than rent due for the minimum rental period, transportation charges and costs of any repairs." *Id.* at 4. The

---

[3]DE 14-2 is the same as Pltf. Exh. 3. Because this particular exhibit does not have page numbers, with this exhibit, I will cite to the docket entry which has stamped page numbers so as to enable pinpoint cites.

3

terms further state that the equipment would be loaded at ER Group's expense "F.O.B. [ER Group's] yard or other point designated by [ER Group]," and Figg would, "at its own expense, . . . do all other loading, unloading, installation, dismantling and transportation of the equipment and shall pay all other freight . . . or other transportation charges . . . from the time of loading by [ER Group] to and including the time of the equipment's return to [ER Group]." *Id.* at 5. Finally, per § 15 of the terms and conditions, ER Group may "declare this Lease is in default if" Figg fails to make any payment under the lease. *Id.* at 6.

The rental agreement includes agreed-upon rental rates for the equipment and accessories leased. *Id.* at 2. The first six line items amount to $29,250.00 per month; the following five line items amount to $38,700.00 per month; and the final line item is for a $5,500.00 lump sum. *Id.* The rental agreement further provides for interest at the rate of 1 Month Libor (London Inter-Bank Offered Rate) + 3.25% and a 5% late fee for payments that are not received within 30 days. *Id.* at 3.

On March 31, 2020, the unassembled equipment (which would later be assembled into the bridge lift) was delivered to the project site. [Pltf. Exh. 4.] On April 14, 2020, ER Group issued an invoice to Figg (Invoice No. 1291) for rental fees covering the period April 28, 2020 to May 25, 2020, in the principal sum of $67,950.00. [Pltf. Exh. 5.] The invoice reiterates that the "Rental is Portal to Portal," meaning, as suggested above, that it could only be ended by returning the equipment to ER Group at its listed facility. *Id.* On April 24, 2020, ER Group issued another invoice (Invoice No. 1293) for

4

engineering services in the amount of $39,725.00. [Pltf. Exh. 6.] On April 24, 2020, ER Group also sent Figg an invoice (Invoice No. 1294) for equipment sales (material for fabrication purposes) in the amount of $14,856.54 [Pltf. Exh. 7.] The same day, ER Group sent another invoice (Invoice No. 1295) for equipment sales (material and labor for fabrication purposes) in the sum of $75,431.60. [Pltf. Exh. 8.] On May 5, 2020, ER Group issued a final invoice (Invoice No. 1298) for rental equipment for the period May 26, 2020 to June 22, 2020, in the principal amount of $67,950. [Pltf Exh. 9.]

On April 7, 2020, CAB terminated Figg as general contractor on the bridge project. But for reasons that are unclear, for many weeks, Figg did not formally notify ER Group about its termination from the job. Christopher Cox, ER Group's President, testified credibly that there was consistent communication between ER Group and Figg during this time period, but Figg continued to indicate that it was moving forward as general contractor on the project. For example, on April 13, Figg's Senior VP and Project Manager William (Jay) Rohleder, Jr., emailed Robert Schlyer of ER Group, in response to Schlyer's inquiry as to "what direction the next few weeks will look like." Rohleder conveyed that Figg "was working out a contractual issue with [CAB]," and was "realistically . . . at least 4 weeks away from the possibility of having a technician on site." The next month, on May 14, 2020, Rohleder informed Schlyer that he did "not see [Figg] being in a position to need someone from ER on site within the next few weeks." [Pltf. Exh. 10; Def. Exh. L.] Rohleder, for his part, testified that after Figg was terminated on April 7, Figg and its surety, Great American Insurance Company, had discussions

5

with CAB about staying on the project; but it was clear that Figg would not be brought back on as general contractor.

By May 27, 2020, Figg had been in possession of ER Group's equipment for nearly two months. It was on that day that ER Group finally got a whiff of trouble between Figg and the owner, CAB. In a phone call between Rohleder and Cox, Rohleder for the first time informed Cox that Figg had been terminated by CAB as the general contractor on the bridge project. Cox testified that he was empathetic and offered to do what ER Group could to assist Figg, as he was hopeful that its dispute with CAB could get sorted out. Cox and Rohleder both confirmed that this conversation was the first instance in which ER Group was formally told by Figg that CAB had terminated Figg as general contractor.

The next day, on May 28, Cox sent an email to Rohleder and Gay Annin of Figg, confirming that he had been informed that CAB had terminated Figg. Cox stated that it would be necessary to "tie up [ER Group's] contractual loose ends on the project" and identified the outstanding invoices Figg had not paid – which totaled a principal balance of $265,913.14. [Pltf. Exh. 11.] In the same email, Cox noted the leased equipment was still on the job site and under rental with Figg. He asked, "Do you plan on cancelling the rental? If so, how do you plan on returning the equipment and when?" In essence, Cox was reminding Figg that the lease was portal to portal and they would continue to be charged until Figg returned the equipment. *Id.* On June 3, Rohleder emailed Cox a letter providing formal "notice of ending the Cline Bridge

6

project equipment lease" and requesting that ER Group arrange with CAB to pick up the leased equipment, as Figg could not access the project site. [Pltf. Exh. 12.]

On cross-examination, Rohleder conceded that this was tantamount to offloading onto ER Group the responsibility for returning the equipment to ER Group in direct contradiction of the lease's terms and conditions. [DE 14-2 at 3.] In other words, Rohleder agreed that this statement presented ER Group with two choices: get the equipment itself (at its cost, while discharging Figg's legal obligation to do so), or negotiate with the new general contractor (to end Figg's lease while keeping the equipment on site). As discussed below, ER Group was ultimately successful in obtaining a replacement lease with the new general contractor effective June 23, 2020 which had the effect of ending Figg's lease for the same equipment.

Cox testified that after receiving the notification letter from Figg, ER Group immediately went to United Bridge Partners (a company affiliated with the owner of the site, CAB), to discuss next steps after Figg's termination. ER Group was put in contact with Granite Construction Company, which was the replacement general contractor retained by CAB after Figg's termination. Relevant to its efforts to mitigate damages, ER Group took immediate steps to start negotiating with Granite to lease the equipment previously leased to Figg. If ER Group was successful in negotiating a new lease with Granite, this would stop the clock on Figg's obligations under the lease.

On June 16, 2020, Cox emailed Rohleder, Linda Figg, and Alan Phipps to update Figg about the status of the rented equipment and past-due invoices. [Pltf. Exh. 13.] Cox

7

let Figg know that it had been in talks with Granite and that it looked like it would enter into a new lease for the equipment, which it needed to complete the bridge project where Figg had left off. He reiterated that the rental agreement, by its plain terms, was "portal to portal," meaning Figg's written notice of termination did not end its obligations under the lease and rental rates would continue to accrue until the equipment was returned to ER Group's facility. Moreover, the email enclosed a table laying out the specific fees in connection with each unpaid invoice discussed above, including Invoice Nos. 1291 and 1298 for leased equipment that was sent to Figg prior to its termination as general contractor. In conclusion, Cox stated that he hoped to have lease terms negotiated with Granite by the end of the week and he would keep Figg posted on whether the new lease for the equipment was executed. *Id.*

Rohleder, on behalf of Figg, responded blithely to Cox's email. He told Cox that all "payment requests should be sent to Great American Insurance Group"—Figg's surety. *Id.* ER Group attempted to obtain payment from Great American. [Pltf. Exh. 14.] But it was rebuffed; Great American said it was not responsible, per the terms of the payment bond.

On June 23, 2020, ER Group in fact executed a replacement rental agreement with Granite for the lease of the equipment for use on the construction project. [Pltf. Exh. 15.] Thus, the equipment was under lease by no later than June 23, which ended Figg's prior lease for the same equipment. What's more, after securing a replacement lease, ER Group negotiated with Granite and United Bridge Partners concerning certain

engineering drawings for the bridge lift, as well as operating and maintenance manuals ER Group had created for the construction of the bridge lift, which were necessary for Granite to properly and safely utilize the lifting device. [*See* Pltf. Exh. 16.]

On direct examination, Cox explained that he was simply looking to recover the outstanding amounts from a company willing to pay. He did not care who paid for the services and equipment provided and simply wanted to be made whole. Ultimately, ER Group successfully negotiated with Granite and United Bridge Partners to pay $130,014.14 due under Invoice Nos. 1293, 1294, and 1295, in exchange for ER Group's release of the bridge lift engineering drawings and related documentation. [*See* Pltf. Exh. 17.] Evidently, it was imperative that Granite have access to those drawings in order to complete the project. But Granite had no such incentive to pay the remaining two invoices for rental equipment fees—Invoice Nos. 1291 and 1298. Each of those invoices had a principal sum of $67,950.00 that remained unpaid for a total due and owing of $135,900. *Id.*

After Figg was thrown off the job by CAB, it arbitrated claims against CAB. On July 15, 2022, a panel of arbitrators entered an Award [Def. Exh. B at 46], which rejected Figg's claim for damages in the amount of $146,884.00 for "leased equipment charges" and late fees for the time period April 28, 2020, to June 22, 2020 (*i.e.*, the period from the lease start to June 23, when Granite executed a replacement lease for the same equipment). The arbitrators were persuaded that Figg was not entitled to these charges

and fees because Figg failed to "provide notice of termination to [ER Group]" until several weeks after the termination, on June 4, 2020. *Id.*

## Conclusions of Law

As noted at the outset, I have already determined that there is no genuine dispute that Figg breached the terms of the rental agreement by failing to pay Invoice Nos. 1291 and 1298 when they came due. [DE 153 at 14.] The only question that remained for trial was the extent of the damages owed to ER Group and whether ER Group acted reasonably in its efforts to mitigate those damages.

The parties agree that Indiana law governs the lease agreement, and I'll follow suit. "Under Indiana law, the essential elements of a breach of contract action are: (1) the existence of a contract, (2) the defendant's breach thereof, and (3) damages." *BMO Harris Bank N.A. v. J-Lin Trucking, Inc.*, 2019 WL 1332174, at *3 (N.D. Ind. Mar. 25, 2019). "A lease is a type of contract, and the elements of a breach of contract claim are the existence of a contract, the defendant's breach of the contract, and damages." *Leaf Funding, Inc. v. Brogan Pharms., Inc.*, 642 F. Supp. 2d 844, 851 (N.D. Ind. 2009) (citing *Indiana Bureau of Motor Vehicles v. Ash*, 895 N.E.2d 359, 365 (Ind. Ct. App. 2008)).

Here's a quick distillation of the applicable state law recently penned by Judge Miller:

> Under Indiana law, "[t]he essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." *McVay v. Store House Comp.*, 289 F. Supp. 3d 892, 896 (S.D. Ind. 2017) (citing *McCalment v. Eli Lilly & Co.*, 860 N.E.2d 884, 894 (Ind. Ct. App. 2007)). The interpretation of a contract is primarily a question of law. *USA Life One Ins. Co. of Indiana v. Nuckolls*, 682 N.E.2d 534, 538 (Ind. 1997).

10

> The court's primary objective is "to give effect to the intentions of the parties as expressed in the four corners of the instrument." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 381 (7th Cir. 2001) (citing *Fetz v. Phillips*, 591 N.E.2d 644, 647 (Ind. Ct. App. 1992)). "Courts may not construe clear and unambiguous provisions, nor may it add provisions not agreed upon by the parties. *Oxford Fin. Grp., Ltd. v. Evans*, 795 N.E.2d 1135, 1142 (Ind. Ct. App. 2003).
>
> "The meaning of a contract is to be determined from an examination of all of its provisions, not from a consideration of individual words, phrases, or even paragraphs read alone." *Art Country Squire, L.L.C. v. Inland Mortg. Corp.*, 745 N.E.2d 885, 889 (Ind. Ct. App. 2001). If the contract is "clear and unambiguous, then it should be given its plain and ordinary meaning." *USA Life One Ins. Co. of Indiana v. Nuckolls*, 682 N.E.2d 534, 538 (Ind. 1997). A "contract term is not ambiguous merely because the parties disagree about the term's meaning." *Roy A. Miller & Sons, Inc. v. Industrial Hardwoods Corp.*, 775 N.E.2d 1168, 1173 (Ind. Ct. App. 2002). "An ambiguity exists only where reasonable people could come to different conclusions about the contract's meaning." *Id.*; *see also Abbey Villas Dev. Corp. v. Site Contrs., Inc.*, 716 N.E.2d 91, 100 (Ind. Ct. App. 1999) ("A contract is ambiguous when it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning.").

*Norfolk S. Ry. Co. v. Glob. Tower, LLC*, 620 F. Supp. 3d 784, 797 (N.D. Ind. 2022).

The lease agreement in this case is a valid and enforceable contract under Indiana law. By its plain terms, it obligates Figg to return the rented equipment to ER Group's facility. There is no dispute that Figg failed to return the equipment to ER Group prior to Granite entering a replacement lease on June 23, 2020, which effectively terminated Figg's lease term for the same equipment because Granite agreed to take over possession and assume liability for the equipment covered by Figg's old lease. [*See* DE 14-2.] Thus, applying the unambiguous terms of the parties' contract, Figg was obligated to pay ER Group the agreed monthly rental rate of $67,950.00 for the rented

11

equipment, until the final piece of equipment was returned to ER Group's facility; and it failed to do so. Without considering ER Group's alleged failure to mitigate, ER Group has met its burden to demonstrate that these monthly rental rates (totaling $135,900.00), plus late fees and interest on the principal balance owing on the lease, were the natural and proximate result of Figg's breach, and thus compensable damage.

Under Indiana law, prejudgment interest is part of the compensatory award necessary to make the plaintiff whole. *See Travelers Ins. Co. v. Transp. Ins. Co.*, 846 F.2d 1048, 1051–52 (7th Cir. 1988). This is a case in which the evaluation of prejudgment interest "rests upon a simple calculation and the terms of the contract make such a claim ascertainable." *Leaf Funding, Inc.*, 642 F. Supp. 2d at 856 ("Damages are ascertainable when measurement is a matter of mathematical computation.") (citing *Bank One, Nat. Ass'n. v. Surber*, 899 N.E.2d 693, 705 (Ind. Ct. App. 2009); *Troutwine Estates Dev. Co., LLC v. Comsub Design and Eng'g, Inc.*, 854 N.E.2d 890 (Ind. Ct. App. 2006)). [*Accord* Pltf. Exh. 23 (formula calculating interest and fees owing under plain terms of lease, "as of" July 22, 2024).] Accordingly, ER Group has met its burden to demonstrate that prejudgment interest "is appropriate" as a component of its damages reasonably and proximately flowing from Figg's breach of the rental agreement – notwithstanding the fact that it was later found through the arbitration that Figg was wrongfully terminated by CAB. Moreover, under the unambiguous terms of the lease agreement (*see* DE 14-2 at 5, § 11(c), ER Group has demonstrated it is entitled to costs and attorney's fees incurred in enforcing the contract.

In my summary judgment decision it was clear to me that Figg's liability was beyond question but the issue of damages was not adequately addressed by the parties in their briefing. In particular, I had uncertainty over whether ER Group made reasonable efforts to mitigate its damages. [DE 153 at 25.] Thus, this was the principal issue at trial. To prevail on the affirmative defense of failure to mitigate, Figg was required to prove "that the non-breaching party has not used reasonable diligence to mitigate its damages." *Leaf Funding, Inc.*, 642 F. Supp. 2d at 852 (quoting *Four Seasons Mfg., Inc. v. 1001 Coliseum, LLC*, 870 N.E.2d 494, 507 (Ind. Ct. App. 2007)). In sum, Figg had to prove by a preponderance of the evidence that (1) ER Group failed to exercise reasonable care to mitigate damages from Figg's failure to pay Invoice Nos. 1291 and 1298 as they came due, and (2) ER Group's failure to exercise reasonable care caused ER Group to suffer identifiable harm in a way not attributable to Figg's breach of the lease agreement. *Willis v. Westerfield*, 839 N.E.2d 1179, 1188 (Ind. 2006). The evidence adduced at trial falls short of satisfying Figg's burden on both fronts.

Initially, the evidence reflects that while Figg was terminated as general contractor on April 7, 2020, it was not until May 27, 2020, that Figg directly notified ER Group about the termination. Recall that this delayed notice was the reason the arbitrators denied Figg's request for "leased equipment charges" in the arbitration between Figg and CAB. [Def. Exh. B at 46.] In any event, it might have been clear to ER Group that something was amiss between Figg and CAB; after all, the project seemed to be stalled and Figg kept putting ER Group off. But the trial testimony and supporting

13

exhibits reflect that ER Group's awareness of the termination, prior to May 27, was at best opaque. Cox credibly testified to having no knowledge of the termination before he spoke with Rohleder; and Rohleder did not suggest that he or anybody else at Figg notified ER Group about the termination before that point. This is important, because in context, the failure to directly convey the problem (*i.e.*, Figg had been terminated and could not access the project site or use the equipment from April 7 to May 27) means that Figg cannot credibly assert that ER Group should have (let alone could have) taken action to mitigate its damages under the lease agreement. Thus, there is no credible mitigation defense whatsoever prior to the notification on May 27, 2020.

As for what ER Group did after it was notified of Figg's termination from the job, the evidence is overwhelming that ER Group did everything it reasonably could do under the circumstances to limit the damages. As discussed above, in his June 3 letter, Rohleder essentially told Cox he could go get the equipment himself or find a replacement to take possession of and assume liability for the equipment – it was clear that Figg was not planning to regain possession of the equipment and return it per the "portal to portal" provision.

What did ER Group do in response? Certainly not sit on its hands and dilly dally. Cox quickly began negotiating with Granite, and just a few weeks later, on June 23, 2020, a replacement lease was entered. If that had not been done, as Figg persuasively notes, the monthly charges would have kept accruing; but because Cox was practical

14

and negotiated a deal with Granite, Figg fortunately avoided further liability for monthly rental fees.

What's more, ER Group negotiated with Granite and United Bridge Partners to resolve some $131,370.43 in additional fees owed by Figg under an associated engineering services agreement. This tactful step acknowledged the reality that CAB not only still needed the equipment, but also the engineering drawings and other documents (*e.g.*, manuals) that ER Group had created for Figg pursuant to their engineering agreement. In other words, Cox was able to leverage CAB's need for the drawings and related documents to complete and use the bridge lift to complete the project, to the effect of resolving a large outstanding balance Figg otherwise would have owed for engineering services. This is strong evidence of ER Group taking seriously its duty to mitigate.

Figg's countervailing argument is that ER Group should have gone further and convinced (or somehow forced) CAB or Granite to pay an additional $135,900.00 in rental fees that accrued prior to execution of Granite's replacement lease on June 23, 2020. To which I ask: why in the world would Granite pay for leasing equipment before it was ever even on the job? More to the point, Figg's suggestion that ER Group could have gotten Granite to pay its bill, is completely unsupported by *evidence.*

All told, the record reflects that ER Group exercised reasonable diligence upon being notified of Figg's termination as general contractor in late May 2020 and Figg's formal request for ER Group to pick up its equipment from CAB on June 3, 2020. The

15

record reflects that had ER Group not taken the steps it did in response, Figg would have in all likelihood faced substantially greater liability (upwards of $256,913.14, along with additional months of rental fees billed at $67,950.00) under the five outstanding invoices that had been issued, not to mention the expense it would have incurred in shipping the equipment back to ER Group's yard. Instead, it simply had to pay the amounts due and owing under Invoice Nos. 1291 and 1298.

In sum, I conclude that ER Group successfully mitigated its damages under the rental agreement, and is thus entitled to the full measure of compensatory damages it seeks under the terms of the parties' lease agreement.

## Conclusion

Based on the foregoing findings of fact and conclusions of law, it is hereby **ORDERED** that Defendant Figg Bridge Builders, LLC is liable to Plaintiff ER Group, LLC for $135,900.00 in unpaid amounts under the parties' equipment rental agreement, as well as daily interest at the rate of 1 Month Libor +3.25% compounded daily, a 5% late fee, and costs and reasonable attorney's fees.

Entry of judgment is stayed to allow ER Group to submit supplemental briefing on the amount of interest, late fees, and attorney's fees within thirty days. Figg may submit a response to the supplemental briefing within thirty days thereafter.

**SO ORDERED**.

ENTERED: September 9, 2024.   /s/ Philip P. Simon
                               PHILIP P. SIMON, JUDGE
                               UNITED STATES DISTRICT COURT